RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 08a0081p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

AMANDA HAWKINS et al.,

        *Plaintiffs-Appellants,*

    *v.*

ANHEUSER-BUSCH, INC.,

        *Defendant-Appellee.*

No. 07-3235

>

Appeal from the United States District Court
for the Southern District of Ohio at Columbus.
No. 05-00688—Gregory L. Frost, District Judge.

Argued: October 30, 2007

Decided and Filed: February 19, 2008

Before: DAUGHTREY and GILMAN, Circuit Judges; EDMUNDS, District Judge.[*]

---

## COUNSEL

**ARGUED:** Alexander M. Spater, SPATER LAW OFFICE, Columbus, Ohio, for Appellants. Mark A. Knueve, VORYS, SATER, SEYMOUR & PEASE, Columbus, Ohio, for Appellee. **ON BRIEF:** Alexander M. Spater, SPATER LAW OFFICE, Columbus, Ohio, for Appellants. Mark A. Knueve, Alicia M. Chiu, Stacia Marie Jones, VORYS, SATER, SEYMOUR & PEASE, Columbus, Ohio, for Appellee.

---

## OPINION

---

RONALD LEE GILMAN, Circuit Judge. Four female employees of Anheuser-Busch, Inc. appeal from a grant of summary judgment in favor of the brewery in this sex-discrimination and retaliation case. Three of the employees—Jackie Cunningham, Amanda Hawkins, and Cherri Hill—allege that sexual harassment by a coworker, Bill Robinson, created a hostile work environment in violation of Ohio Revised Code § 4112. Hill and the fourth employee, Kathryn Jackson, also claim that the brewery is liable for Robinson's acts of retaliation.

The district court granted summary judgment in favor of Anheuser-Busch on the discrimination claims after finding that (1) the women failed to make a showing that the alleged

---

[*]The Honorable Nancy G. Edmunds, United States District Judge for the Eastern District of Michigan, sitting by designation.

conduct was sufficiently severe or pervasive to create a hostile work environment, and (2) no reasonable juror could conclude that Anheuser-Busch knew or should have known of the harassment, or that it failed to take prompt and appropriate corrective action. As to the retaliation claims, the court dismissed them on the grounds that (1) this circuit has not previously recognized a claim for coworker retaliation, and (2) Hill and Jackson failed to allege conduct by Anheuser-Busch that rose to the level of an adverse employment action.

For the reasons set for below, we **AFFIRM** the district court's grant of summary judgment as to Hawkins's hostile-work-environment claim and Jackson's retaliation claim, but we **REVERSE** the grant of summary judgment as to Cunningham's and Hill's hostile-work-environment claims and Hill's retaliation claim and **REMAND** the case for further proceedings consistent with this opinion.

## I. BACKGROUND

### A. Factual background

#### 1. *Diana Chiandet*

The first reported incident of Robinson harassing a female employee at Anheuser-Busch's plant in Columbus, Ohio involved an employee named Diana Chiandet. Chiandet worked on brewery line 75 with Robinson. Although Chiandet is not a plaintiff in the present case, prior incidents of sexual harassment involving Robinson are relevant to the claims in this case, as discussed in Part II.C.2. below.

Chiandet complained to brewery management in July of 1993 that she had received three harassing and threatening anonymous notes. The first note stated: "Are you looking for a real good hot time with a real hard body man if so I'm your man. Call my line to nite [sic] for some read [sic] hot sex talk. 1800-334-1256. I'll be waiting." The second note read: "Hi - Are you lonely and looking for a real hot time if so I'm the man for you. If you want something Hot and Hard call me at 1-800-335-666. They call me Mr. Big Daddy." The final note stated: "What's up sexy. So are your ready for something nice and hard because I think it's about time we got together so we can have a good time all nite [sic] long. I no [sic] you like it *long and* Hard. And I have tools to do that all nite [sic] thing. P.S. Don't worry I will make real good to you. I no [sic] what you like *PAIN*." On August 4, 2003, shortly after reporting the notes to management, Chiandet told her supervisor that her car had been sideswiped at work.

The brewery concluded that the notes were "inappropriate, lewd, suggestive and threatening," and launched an investigation into the incident. A handwriting expert promptly determined that Robinson was the author of the notes. Although Robinson originally denied writing them, he later admitted to being the author after he was confronted with evidence from the handwriting expert. This caused Anheuser-Busch to terminate Robinson's employment in early September of 1993. Robinson pursued a union-backed grievance.

Under the collective bargaining agreement at the brewery, management may terminate employees only for just cause. Employees who wish to challenge a disciplinary action taken against them can file a grievance. Grievances are entertained first by a department head, then by a human resources manager, and finally by a Multi-Plant Grievance Committee. The Grievance Committee is composed of two company representatives, two union representatives, and a mutually agreed-upon arbitrator. Following Robinson's appeal, the Grievance Committee reinstated him after a six-month suspension.

### 2. *Jackie Cunningham*

Cunningham was hired by Anheuser-Busch in May of 1996. She was transferred to brewery line 75 in 1999 and began working with Robinson at that time. Cunningham became concerned about Robinson's conduct after she saw him near her residence and believed that he was following her. She alleged that, shortly after she saw Robinson near her home, he began to harass her at work. Specifically, Cunningham recounted in her deposition that (1) during a training session in 1999, Robinson sang a rap song to her with the lyrics: "Baby, won't you back that thing up," and then held money in his hand and said: "Is that what it's gonna take?", (2) Robinson tried to put his hand on her shoulder, but she moved away, (3) Robinson said: "I will suck your pussy but you got to suck my dick," (4) Robinson caressed her back and she responded by screaming at him: "Don't touch me," (5) Robinson told her to come over to his vehicle at work and, when she refused, he chased her around and tried to grab her as she ran away, (6) Robinson asked her: "Why don't you just suck my dick?", and (7) Robinson told Cunningham that he was getting rid of his girlfriend, and asked her: "Why don't you just make up your mind?" while trying "to feel on her." Cunningham also said that she could not remember every instance of harassing behavior, but that Robinson would harass her "on and off" and would "push on and on."

She allegedly complained to her supervisor, Eric Steinberg, "a few times" about Robinson's behavior and contacted plant operations manager Richard Sambecki to request a transfer. Cunningham also asserted that she told her supervisors that life was "unbearable" on line 75 and that Robinson was "really trying to make [her] job difficult," but admitted that she did not explicitly say that Robinson was sexually harassing her. She also talked with her union steward, Leslie Schoenian, about Robinson's behavior. Schoenian advised Cunningham of the things that Robinson "was capable of" and suggested that the best solution would be to simply move to another brewery line. Shortly thereafter, Cunningham told Schoenian that she wanted to move lines, and Schoenian discussed the matter with management. The brewery then transferred Cunningham to a new line. Even after the transfer, however, Cunningham alleged that she felt harassed by Robinson's friends and said that "stuff still followed [her]" to her new position.

### 3. *Cherri Hill*

Hill began working at the brewery in August of 1999. In January of 2000, she started working on line 75 with Robinson. She alleges that Robinson began harassing her in November of 2000. In her deposition, Hill recounted numerous instances of touching—stating that Robinson touched her arms, rubbed her shoulders, and walked up close behind her—and that he regularly made "lewd and explicit" comments. When Hill asked Robinson to stop, he said that he knew she "liked it" and that he "wanted to have sex" with her. Hill stated that Robinson would walk close to her, touch her behind, and that on one occasion he rubbed against her with "his private area" and grabbed her around the waist. She also said that on three or four occasions Robinson told her "she had big breasts" and a "big butt." On another occasion, Robinson told her "he wanted to fuck" her and said, "I bet you have some good pussy and I know that you would like this. You should let me take you away from your boyfriend." In addition to recalling theses specific incidents, Hill testified that Robinson made lewd and sexual comments "all the time."

Hill told a coworker in November of 2000 that Robinson was bothering her. She also contacted Schoenian, her union steward, to complain about Robinson's conduct. Hill then asked her supervisor, Don Schlarman, if she could transfer lines after telling him that Robinson "had been touching her and talking dirty to her." Donald Manley, the brewery's human resources manager, was informed of Hill's complaint and ordered Cortlin Davidson, a human resources investigator and assistant manager, to look into Hill's allegations.

Davidson began his investigation by interviewing Hill. During the interview, Hill enumerated the ways in which Robinson had harassed her and informed Davidson that Robinson had also harassed Cunningham. Davidson's notes from his interview with Hill recount that Hill complained that Robinson had been grabbing her, rubbing up against her, making suggestive sexual remarks, and that "every time" they were together Robinson was doing something inappropriate "like winking, blowing kisses, touching her or grabbing her."

On December 9, 2000, a few weeks after Hill reported the allegations of harassment, but before the brewery had finished its investigation, someone set fire to Hill's car while it was parked at her home. Although Hill believed that Robinson was responsible for the fire, no arrests related to the fire were made. Hill informed the fire investigators about her suspicions and reported the incident to both Davidson and Schlarman. Davidson did not investigate the incident, and instead told Hill that if she did not have any proof of Robinson's involvement, she should not make allegations against him. Schlarman told Hill that she could be sued for slander for accusing Robinson. Nothing in the record suggests that the brewery took any steps to investigate Hill's allegation that Robinson set fire to her car. At some point during December of 2000, however, the brewery transferred Hill to a different line.

Davidson interviewed Robinson as part of his investigation into Hill's original allegations of harassment. When Robinson was informed of Hill's complaint, he denied harassing her. Robinson was apparently never asked about the fire.

On December 4, 2000, Davidson spoke with Cunningham to follow up on Hill's allegations of harassment. At first, Cunningham said that she did not want to "get involved" in the investigation, but she eventually confirmed that Robinson had sexually harassed her. Cunningham told Davidson that Robinson was "always doing something" and that he was "always rubbing her back and touching her and she got sick of telling him to stop." Davidson interviewed a total of 10 employees who worked on line 75. None of the employees on the line, including Cunningham, admitted to witnessing Robinson harass Hill. Schoenian, however, confirmed that Hill had reported the harassment to her on two occasions. Hill had also told another employee, Brandi Lawry, that Robinson made Hill "feel uncomfortable," and Lawry reported this to Davidson.

At the end of his report, Davidson concluded: "Based on the interviews conducted, I believe that Bill Robinson did behave in a sexually inappropriate manner with both Cherri Hill and Jackie Cunningham." Despite the report's conclusion, the brewery did not discipline Robinson. The investigation was closed, and Hill received a letter informing her that Anheuser-Busch had been unable to substantiate her allegations of harassment, that corporate policy prohibited retaliation for raising such concerns, and that she could contact management if she had any questions. Nothing in the record indicates whether the brewery spoke with Robinson at the close of the investigation, and there is no evidence showing that a letter was ever sent to him.

After Davidson gave his report to management, Cunningham was called into plant manager Dan Brown's office for a second interview and asked if Robinson had sexually harassed her. Cunningham responded "no" and left the room. During her deposition, Cunningham was asked why she had recanted her allegations of harassment. Cunningham responded that she was afraid of Robinson because of stories that she had heard about him and that she feared he would "come back to get her." The record is unclear about whether the interview with Cunningham took place before or after Hill's car was set on fire.

Following the close of its investigation into Hill's allegations in December of 2000, Anheuser-Busch corporate headquarters received an anonymous letter criticizing the investigation into Hill's allegations and stating that "fellow employees on the line are intimidated from telling the truth because they are well aware of what [Robinson] is capable." The letter alleged that the

brewery had botched the investigation by failing to interview everyone on the line who knew about the harassment and declared that employees were "afraid to get involved" in the investigation because "bad things" happened to women who made accusations against Robinson. It recounted specific allegations of violence against women at the brewery, noting that Hill's car had been set on fire shortly after she accused Robinson of sexual harassment, that Robinson had threatened to "kill that Bitch" (meaning Hill) if he lost his job, and that all four tires of another employee's car were slashed after a woman threatened to report that Robinson had harassed her. The letter also stated that Robinson bragged in the cafeteria that he had slashed the tires to "repay the woman for telling on him," and that it was "this type of retribution" that "keeps people from speaking out" against Robinson. Finally, the letter concluded by stating: "I have no vendetta against Bill Robinson. My only hope is that the truth be told and Cherri Hill might be seen as an example of what to do when they've been sexually harassed." It was signed, "a concerned employee."

Although management at the brewery where Robinson worked was informed about the allegations of fear and retaliation contained in the letter, the brewery did not reopen the investigation, warn Hill, ask any employees if they felt threatened by Robinson, or create a confidential means for reporting allegations of harassment. Robinson continued to work on line 75 until he was terminated for harassing Hawkins and another employee in 2003.

### 4. *Amanda Grace-Hawkins and Kathryn Jackson*

Hawkins began work on line 75 sometime in 2002. Until May of 2003, Hawkins said that she and Robinson were friends at work and occasionally socialized. Robinson and Hawkins were working on the line on Friday, May 16, 2003 when Robinson began to "play around." Hawkins flicked Robinson's hat and, in response, Robinson "forcefully poked" Hawkins in the right breast and then started laughing and dancing around. She alleges that Robinson then said: "I did it . . . what are you gonna do?" Hawkins reported the incident to her supervisor, Jim Gress, the following Monday and requested that either she or Robinson be taken off of line 75 because she did not want to work with him anymore. At that time, Hawkins asked that her report be kept confidential, but Gress later informed her that he was required to report the incident. Gress made the report and Hawkins was called to a meeting with management. Hawkins stated at the meeting that she was afraid to make a formal complaint because she had heard that Robinson "was crazy" and "stuff might happen" to her. Although the record is unclear as to precisely when Robinson was removed from line 75, it occurred no later than nine days after Hawkins first reported the incident to management.

Soon after learning of Hawkins's complaint, the brewery assigned Shirley Boyd to investigate the incident. During Boyd's investigation, another employee, Kathryn Jackson, confirmed that Robinson had poked Hawkins in the breast and acknowledged that she had seen Hawkins trying to get away from Robinson. Gress also confirmed that the night after Hawkins complained about Robinson, Robinson "stared intently" at Hawkins while they were working together on line 75. And at some point before Robinson was terminated, Hawkins reported that someone had "keyed" her car.

During Boyd's investigation, LeDawn Hudson, another brewery employee, told Boyd that Robinson had called her a "dyke" in 2002 and had threatened to hit her with a shovel if she complained. Hudson also reported that Robinson had thrown a bottle at her and that, for two weeks after Robinson threatened her, her tires were flattened every day. She said that she knew that Robinson had done harassing things before but that nothing had happened to him, and that women who complained about him experienced retaliation.

Supervisors at the brewery also made comments to Boyd indicating that they knew that Robinson was dangerous and had regularly harassed and retaliated against women. Gress told Boyd

that Robinson's "primary target is single black women" and that "if the woman threatened to take him to the office, weeks later minor things started happening to the woman." Another supervisor, Terry Williamson, told Boyd that he knew that Robinson "had a dark side."

Robinson was suspended in May of 2003 after Hudson made her report and was terminated by the brewery on June 2, 2003. The union once again defended Robinson in the grievance process, but this time the Grievance Committee upheld his termination. Anheuser-Busch had a uniformed police officer escort Robinson off the premises, hired an investigator to monitor Robinson during the grievance process, and offered to hire security for both Hawkins and Jackson. Hawkins accepted the security but Jackson declined. On July 29, 2003, someone poured gasoline in Jackson's basement and set fire to her house. Robinson was not an employee of the brewery at the time of the fire.

Hawkins testified at her deposition that, after she reported the harassment to management but before Robinson was removed from line 75, other employees told her about rumors involving Robinson's harassment of other women. Her brief, however, does not pinpoint any evidence in the record establishing that Hawkins knew about the specific incidents involving Chiandet, Cunningham, or Hill. The record does establish, however, that on the day Robinson poked Hawkins in the breast, Hudson told Hawkins about her ordeals with Robinson.

Robinson's termination became final on July 21, 2003, the date that the Grievance Committee affirmed Anheuser-Busch's termination of Robinson. In August of 2003, while investigations into the two fires were ongoing, Robinson shot his girlfriend and then killed himself.

**B.      Procedural background**

Cunningham, Hawkins, Hill, and Jackson filed suit in the Franklin County Common Pleas Court against Anheuser-Busch in June of 2005. The brewery removed the case to federal court based on diversity jurisdiction. On Anheuser-Busch's motion for summary judgment, the district court dismissed all claims. This timely appeal followed.

## II.  ANALYSIS

**A.      Standard of review**

We review de novo the district court's grant of summary judgment. *Int'l Union v. Cummins, Inc.*, 434 F.3d 478, 483 (6th Cir. 2006). Summary judgment is proper where no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). In considering a motion for summary judgment, the district court must construe the evidence and draw all reasonable inferences in favor of the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The central issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

**B.      Sex discrimination claims based upon coworker harassment**

Cunningham, Hawkins, and Hill brought claims for sexual harassment under Ohio Revised Code § 4112. Ohio courts have held that federal caselaw interpreting Title VII of the Civil Rights Act of 1964 ("Title VII") "is generally applicable" to cases involving sexual harassment claims under state law. *Hampel v. Food Ingredients Specialties, Inc.*, 729 N.E.2d 726, 731 (Ohio 2000). All references throughout this opinion to Title VII are therefore equally applicable to the plaintiffs' claims under Ohio Revised Code § 4112.

A violation of Title VII is established if "discrimination based on sex has created a hostile or abusive work environment." *Burnett v. Tyco Corp.*, 203 F.3d 980, 982 (6th Cir. 2000) (citing *Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 66 (1986)). To establish a prima facie case based upon coworker harassment, a plaintiff must establish that (1) the sexual harassment was unwelcome, (2) the harassment was based on sex, (3) the harassing behavior was sufficiently severe or pervasive to affect the terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment, and (4) the employer knew or should have known of the harassment and failed to take immediate and appropriate corrective action. *Knox v. Neaton Auto Prods. Mfg.*, 375 F.3d 451, 459 (6th Cir. 2004); *see also Hampel*, 729 N.E.2d at 732-33.

The district court granted summary judgment on the employees' hostile-work-environment claims on two grounds. First, the court found that none of the women proffered sufficient evidence to establish the third element of the hostile-work-environment test; namely, that the alleged harassing conduct was sufficiently severe or pervasive to create a hostile work environment. Second, the court found that no reasonable juror could conclude that Anheuser-Busch knew or should have known of Robinson's harassment or that it failed to take prompt and appropriate corrective action. Because Cunningham's and Hill's hostile-work-environment claims are interrelated, we will discuss them together. We will address Hawkins's claim separately.

## C.    Establishing a hostile-work-environment claim under Title VII

"Title VII affords employees the right to work in an environment free from discriminatory intimidation, ridicule, and insult." *Meritor Sav. Bank*, 477 U.S. at 65. Whether harassing conduct is sufficiently severe or pervasive to establish a hostile work environment is "quintessentially a question of fact." *Jordan v. City of Cleveland*, 464 F.3d 584, 597 (6th Cir. 2006) (internal quotation marks omitted). To determine whether a work environment is "hostile" or "abusive," courts look at the totality of the circumstances. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993); *see also Williams v. Gen. Motors Corp.*, 187 F.3d 553, 562 (6th Cir. 1999) (stating that "it is well-established that the court must consider the totality of circumstances"). The factfinder must evaluate the conduct at issue by both an objective and subjective standard. *Harris*, 510 U.S. at 21-22. This requires a plaintiff to establish both that the harassing behavior was "severe or pervasive" enough to create an environment that a reasonable person would find objectively hostile or abusive, and that he or she subjectively regarded the environment as abusive. *Id.* Summary judgment is appropriate only if the evidence is so one-sided that there is no genuine issue of material fact as to whether there was a hostile work environment. *Abeita v. Transam. Mailings, Inc.*, 159 F.3d 246, 250 (6th Cir. 1998).

Two legal issues must be addressed in considering whether the harassment that Cunningham and Hill experienced rises to the level of a Title VII (and thus an Ohio law) violation: (1) whether the harassing acts as alleged by each plaintiff were sufficiently severe or pervasive so as to create a jury issue regarding their hostile-work-environment claims, and (2) whether a plaintiff alleging a hostile work environment may introduce evidence of other incidents of sexual harassment in the workplace directed at employees other than the plaintiff, but of which the plaintiff was aware. We will address each question in turn.

### 1.    Severe or pervasive

The determination of whether harassing conduct is sufficiently severe or pervasive to establish a hostile work environment is not susceptible to a "mathematically precise test." *Abeita*, 159 F.3d at 251 (citation omitted); *see also Harris*, 510 U.S. at 21 (using the phrase "severe *or* pervasive" as opposed to "severe *and* pervasive"). Conduct that is merely offensive is not actionable. *Harris*, 510 U.S. at 21. To be actionable, the harassment must consist of more than words that simply have sexual content or connotations. *Knox*, 375 F.3d at 459-60 (holding that various comments and foul language were not severe or pervasive); *see also Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80

(1998) (holding that plaintiffs must prove more than that a comment was tinged with offensive sexual connotations). Instead, the workplace must be permeated with "discriminatory intimidation, ridicule or insult" sufficiently severe or pervasive to alter the conditions of employment. *Meritor Sav. Bank*, 477 U.S. at 65-67. A nonexhaustive list of factors for the court to consider include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Jordan*, 464 F.3d at 597 (quoting *Harris*, 510 U.S. at 23).

This court in *Abeita* acknowledged that sexual comments and harassing acts of a "continual" nature are more likely to be deemed pervasive. 159 F.3d at 252. In that case we reversed a grant of summary judgment in a hostile-work-environment claim after finding that the victim's assertion that the harrasser's sexual comments were "ongoing," "commonplace," and "continuing" was sufficient to survive summary judgment on the severe or pervasive test. *Id.* We then noted that when a victim makes allegations of ongoing harassment, the "inability to recount any more specific instances goes to the weight of her testimony, a matter for the finder of facts." *Id.*

This court has also made clear that harassment involving an "element of physical invasion" is more severe than harassing comments alone. *Williams*, 187 F.3d at 563. In *Williams*, we found that harassing sexual comments and one act of touching contained an element of physical invasion that, "at minimum, . . . raise[d] a question of fact for the jury" and could not be properly dismissed on summary judgment. *Id.* The harrasser in *Williams* (1) used the "F-word" and said: "Hey slut" in William's presence, (2) told Williams that she could "rub up" against him anytime, (3) said: "You would kill me, Marilyn. I don't know if I can handle it, but I'd die with a smile on my face," (4) walked up behind Williams and said: "Back up: just back up," (5) said "I'm sick and tired of these fucking women," and (6) at one point, when he saw her writing "Hancock," he touched her neck and said: "You left the dick out of the hand." *Id.* at 559. Williams also alleged that she was the subject of a pranks, that a box was glued to her desk, and that she was denied breaks and overtime. *Id.*

In the present case, both Cunningham and Hill alleged that Robinson's harassment was ongoing and continual. They recited comments significantly more graphic, personal, and sexually explicit than the comments at issue in *Williams*, and they recounted acts of touching and unwelcome physical contact that establish an element of physical invasion.

A review of Cunningham's deposition clearly reflects her testimony that Robinson harassed her "on and off" and would "push on and on." Her allegations that Robinson's harassment was pervasive were also memorialized in records from the brewery's investigation into his behavior. Notes taken by Davidson, the investigator assigned to look into Hill's allegation of harassment, show that Cunningham reported that Robinson was "always doing something," such as "always rubbing her back and touching her," and that "she got sick of telling him to stop." Cunningham not only asserted that Robinson's actions were continual, but stated that Robinson repeatedly made crude requests for oral sex, solicited a sexual relationship, and invaded her physical space by rubbing her, touching her, and trying to "feel on her."

Like Cunningham, Hill testified at her deposition that Robinson's campaign of harassment was continuous. She alleged that he made lewd and sexual comments "all the time." Hill also told Davidson that "every time" she worked with Robinson he engaged in inappropriate behavior "like winking, blowing kisses, touching her or grabbing her." She said that Robinson made regular crass and sexual references to her private body parts, requested oral sex in graphic terms, and solicited sex from her on multiple occasions. Hill further asserted that Robinson regularly attempted to touch her when they worked on the line, that he rubbed against her with his private parts, and that he tried to grab her waist.

Hill also contends that Robinson's campaign of harassment continued when he allegedly set fire to her car in retaliation for her reporting him to management. The fire, however, was set after work hours and occurred when Hill's car was parked at her home. This circuit has not decided whether off-premises harassment by a coworker may be considered as part of the severe or pervasive test under Title VII's sexual harassment provisions. *See Duggins v. Steak'N Shake, Inc.*, 3 F. App'x 302, 311 (6th Cir. 2001) (noting that although the Sixth Circuit has not directly addressed the issue of off-premises harassment by an employee, "other courts have held that generally an employer is not liable for the harassment or other unlawful conduct perpetrated by a non-supervisory employee after work hours and away from the workplace setting").

Because, independent of her allegations related to the fire, Hill has set forth facts sufficient to survive summary judgment on the issue of whether the harassment she experienced was severe or pervasive, we need not now decide the question of whether courts may consider off-premises harassment as part of the severe or pervasive test under Title VII. We will therefore discuss Robinson's alleged involvement in setting fire to Hill's car in Part F. of this opinion, which addresses Hill's retaliation claim. *See Burlington Northern & Santa Fe Ry. Co. v. White*, 126 S. Ct. 2405 (2006) (holding that employers may be held liable for off-premises acts of retaliation under Title VII's anti-retaliation provision).

### 2.      *Other acts of harassment as evidence of a hostile work environment*

Anheuser-Busch cites *Burnett v. Tyco Corp.*, 203 F.3d 980 (6th Cir. 2000), for the proposition that this court may consider other acts of harassment only if they are "directed to, and with the knowledge" of the plaintiff. *Id.* at 981 (affirming summary judgment for the employer after finding that three alleged acts of harassment directed at the plaintiff were not sufficiently severe to constitute a hostile work environment and declining to consider other-act evidence because the plaintiff was not aware of the other acts). Relying on *Burnett,* the brewery argues that we are limited to the consideration of other acts that a plaintiff personally observed. The brewery also argues that we may consider other acts of harassment only if they occurred during the same time period that the plaintiff was being harassed.

A review of *Burnett* and Sixth Circuit caselaw addressing other-act evidence, however, makes clear that we may consider evidence of other acts of harassment of which a plaintiff becomes aware during the period his or her employment, even if the other acts were directed at others and occurred outside of the plaintiff's presence. One of the first cases in this circuit to address other-act evidence in the context of a hostile-work-environment claim was *Abeita*, 159 F.3d at 246. In *Abeita* we declined to consider testimony from employees other than the plaintiff that a supervisor had acted "boorishly toward women in general" because there was no evidence that the plaintiff was aware of the other incidents while she was employed. *Id.* at 249 n.4. We did, however, consider general comments that were not directed at the plaintiff but that were made in her presence. *Id.* at 249.

Another key case is *Jackson v. Quanex Corp.*, 191 F.3d 647, 660 (6th Cir. 1999), where we held that the district court erred when it refused to consider discriminatory conduct directed towards African-American employees other than the plaintiff. Noting that "offensive comments need not be directed at a plaintiff in order to constitute conduct violating Title VII," we concluded that evidence of racist conduct targeting other employees "certainly mattered as to whether the work environment" was objectively hostile, and "evidence that [the plaintiff] learned of these incidents clearly demonstrated that the plaintiff subjectively perceived that her work environment was one hostile to her." *Id.*

The court in *Jackson* reasoned that the consideration of offensive acts solely directed at the plaintiff in isolation from other acts that occur in the workplace would "defeat the entire purpose of allowing claims based upon a 'hostile work environment' theory, as the very meaning of

'environment' is '[t]he surrounding conditions, influences or forces which influence or modify.'" *Id.* at 661 (quoting Black's Law Dictionary 534 (6th ed. 1990)). We also clearly considered evidence of racial harassment that occurred outside of the plaintiff's presence when evaluating whether the harassment was severe or pervasive. *Id. at 650-62*; *see also Moore v. KUKA Welding Sys.*, 171 F.3d 1073, 1077-79 (6th Cir. 1999) (considering evidence of racial harassment that occurred outside the presence of the plaintiff because the plaintiff later learned through a coworker that a derogatory term had been used).

This court's caselaw therefore makes clear that the factfinder may consider similar acts of harassment of which a plaintiff becomes aware during the course of his or her employment, even if the harassing acts were directed at others or occurred outside of the plaintiff's presence. Cases from our sister circuit are in accord. *See Hurley v. Atlantic City Police Dep't*, 174 F.3d 95, 110-112 (3d Cir. 1999) (holding that evidence that women other than the plaintiff were subjected to a hostile work environment was more probative than prejudicial, and thus admissible in a Title VII sexual harassment action, even though many of the acts occurred outside the presence of the plaintiff); *Schwapp v. Town of Avon*, 118 F.3d 106, 111-12 (2d Cir. 1997) (holding that a plaintiff's second-hand knowledge of racially derogatory comments or jokes can impact the work environment); *Rodgers v. W. S. Life Ins. Co.*, 12 F.3d 668, 673-75 (7th Cir. 1993) (noting that racial epithets targeted at other employees were relevant to a plaintiff's hostile-work-environment claim and considering racial statements made outside of the plaintiff's presence); *Hicks v. Gates Rubber Co.*, 833 F.2d 1406, 1416 (10th Cir. 1987) (concluding that evidence that other employees had been sexually harassed should be considered by the trial judge in determining whether a hostile-work-environment claim has been established and noting that "the few courts that have addressed this issue have generally concluded that incidents involving employees other than the plaintiff are relevant in establishing a generally hostile work environment").

This is not to say that a plaintiff's knowledge of other acts of harassment will necessarily establish a hostile work environment, or that a factfinder is required to give significant weight to other acts that are unrelated to the plaintiff's allegations. When determining the relative weight to assign similar past acts of harassment, the factfinder may consider factors such as the severity and prevalence of the similar acts of harassment, whether the similar acts have been clearly established or are mere conjecture, and the proximity in time of the similar acts to the harassment alleged by the plaintiff. *Cf. Harris*, 510 U.S. at 23 (instructing courts to consider the severity and frequency of acts of harassment as part of the severe or pervasive test).

The degree to which a past act of harassment is relevant to the determination of whether a plaintiff's work environment is hostile is a fact-specific inquiry that requires courts to determine the relevancy of past acts on a case-by-case basis. In general, however, the appropriate weight to be given a prior act will be directly proportional to the act's proximity in time to the harassment at issue in the plaintiff's case. The further back in time the prior act occurred, in other words, the weaker the inference that the act bears a relationship to the current working environment. On the other hand, more weight should be given to acts committed by a serial harasser if the plaintiff knows that the same individual committed offending acts in the past. This is because a serial harasser left free to harass again leaves the impression that acts of harassment are tolerated at the workplace and supports a plaintiff's claim that the workplace is both objectively and subjectively hostile.

The district court in the present case recognized the principle that similar acts of harassment of which a plaintiff is aware during her employment can be introduced as evidence of a hostile work environment. It failed to apply that principle, however, when it declined to credit evidence that Cunningham and Hill were aware that Robinson was a serial harasser who had engaged in past inappropriate and harassing behavior with other women on brewery line 75.

### a.       Other-act evidence relevant to Cunningham's claim

Cunningham testified at her deposition that before Robinson began harassing her, she knew that Robinson had harassed Chiandet. She also alleged that while she was being harassed by Robinson, she had told Sambecki of hearing Robinson call another employee, Jackson, a "white bitch." Cunningham further contended that, to her knowledge, the brewery did not investigate the latter incident.

Because the incident involving Chiandet is remote in time, it is entitled to proportionately less weight. But the incident involving Jackson occurred at the same time that Cunningham was being harassed by Robinson, and thus has greater persuasive force. Although the other-act evidence here is not overwhelming, it is sufficiently probative to support Cunningham's claim that there is a genuine question of material fact as to whether the workplace was hostile.

### b.       Other-act evidence relevant to Hill's claim

The brewery argues that the district court was correct in refusing to consider other-act evidence in relation to Hill's claim because Hill did not learn the details surrounding Robinson's harassment of Chiandet and Cunningham until after Robinson had harassed her. A review of Hill's deposition, however, reveals that she was aware of Robinson's prior harassment of Chiandet and Cunningham while she was still working on line 75. Hill noted that before she reported Robinson, Cunningham had told her "on several occasions" that she was having problems with Robinson, that Robinson "was crazy and she just didn't like him," and that she was "not comfortable being around the guy."

The day after Hill reported the harassment, but before the brewery had taken any remedial action, Cunningham and Hill were working together on line 75 and Cunningham explicitly told Hill that Robinson was "sexually harassing her[,] that he has been touching her and saying lewd remarks to her," and that Robinson had "followed her home . . . on several different occasions." Cunningham also told Hill that the brewery was "not going to do anything" about Robinson, and informed Hill about an earlier incident of sexual harassment involving Robinson and another female employee, presumably Chiandet. Hill recounted that Cunningham was "very emotional" every time she talked about Robinson, and that one time "she even cried, broke down and just cried because she said it was just . . . so hard for her to even come to work and be around him because of what he was doing to her." The record also shows that notes taken during the brewery's investigation into Hill's complaints of harassment on line 75 clearly state that Hill told the investigator that he should talk to Cunningham because the latter had also been harassed by Robinson.

Because the incident involving Chiandet occurred seven years before Robinson began harassing Hill, and before Hill was employed by the brewery, it adds only limited weight to Hill's claim. But Hill's deposition testimony is sufficient to establish her awareness that Robinson had previously harassed two other women at the brewery, one remote in time and one contemporaneous with Hill's time on line 75, giving Hill reason to believe that Robinson was a serial harasser who regularly intimidated women at the workplace.

We conclude that when the other-act evidence is considered in concert with the allegations that Cunningham and Hill made about Robinson's harassment, both women have raised a genuine issue of material fact as to whether the workplace at Anheuser-Busch was hostile. Summary judgment on that basis was therefore inappropriate.

## D.    Establishing employer liability for coworker harassment

Once a hostile work environment is established, an employee alleging sexual harassment by a coworker must still establish that the employer is liable because it knew or should have known of

the harassment, yet failed to take prompt and appropriate corrective action.  *EEOC v. Harbert-Yeargin, Inc.*, 266 F.3d 498, 518 (6th Cir. 2001).  This court held in *Blankenship v. Parke Care Ctrs., Inc.*, 123 F.3d 868 (6th Cir. 1997), that when coworker harassment is at issue, an employer is not liable for "mere negligence," but is liable "if its response manifests indifference or unreasonableness in light of the facts the employer knew or should have known."  *Id.* at 872-73.

For the sake of clarity, we note that although this court's decision in *Blankenship* has been modified by the Supreme Court's decisions in *Faragher v. City of Boca Raton*, 524 U.S. 775, 780, 807 (1998)*,* and *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 758-59 (1998), *Blankenship* remains good law for the proposition that a company may be held liable for coworker harassment if its "response manifests indifference or unreasonableness in light of the facts the employer knew or should have known."  *Blankenship*, 123 F.3d at 873; *see also Collette v. Stein-Mart, Inc.*, 126 F. App'x 678, 684 n.3 (6th Cir. 2005) (noting that *Blankenship*'s suggestion that "mere negligence" is insufficient to establish employer liability was overruled by *Ellerth/Faragher* and suggesting that, post-*Ellerth/Faragher*, "an employer may be held liable when its remedial response is merely negligent, however well-intentioned"); *Fenton v. HiSAN, Inc.*, 174 F.3d 827, 829 (6th Cir. 1999) (holding that, post-*Ellerth/Faragher*, the standard for coworker harassment is negligence, but applying *Blankenship* to define negligence as an employer response that "manifests indifference or unreasonableness in light of the facts").

In the present case, we will therefore first evaluate whether Cunningham and Hill presented sufficient evidence to show that Anheuser-Busch knew or should have know about Robinson's harassment.  We will then determine if the proffered evidence raises a genuine issue of material fact as to whether the brewery's response to their complaints was unreasonable.

### 1.      Knew-or-should-have-known standard for employer liability

### a.      Brewery's notice that Cunningham was harassed

The record is less than clear as to what Cunningham told her supervisors about Robinson's behavior during the time that she was being harassed by him.  When asked if she reported individual incidents of harassment, Cunningham responded that she had not.  And during the investigation into the allegations that Hill made against Robinson, Cunningham admitted that, when she had asked to transfer lines, she did not tell her supervisors that she wanted to move specifically because Robinson was sexually harassing her.   But Cunningham also stated in her deposition that, while she was on line 75, she went to her supervisors to request a transfer because Robinson was "really trying to make [her] job difficult."

She further asserted that she talked to her supervisor Eric Steinberg "a few times" about Robinson's behavior and that she contacted Sambecki, the plant operations manager, to request a transfer, telling him that working with Robinson was "unbearable."  Cunningham described an incident where she was so frustrated with Robinson's behavior that she called Sambecki over the intercom and stated that "the whole plant heard me announcing for Sambecki."  She also said that Sambecki was unreceptive to her attempts to talk to him about Robinson, and that on one occasion he shut the door on her.  Cunningham said that she felt as if Sambecki "didn't care."

Despite Cunningham's testimony, the district court found that "there is a substantial difference between unspecific conclusory allegations and reporting actual specific harassment," and held that there was no genuine issue of material fact as to whether the brewery had actual or constructive notice that Robinson had harassed Cunningham. We respectfully disagree. Summary judgment requires the court to view all evidence in the light most favorable to the nonmoving party and is appropriate only if the evidence in the record is so one-sided that no reasonable jury could find for that party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

A review of the record before us establishes that there is a genuine issue of material fact as to whether the management at Anheuser-Busch knew or should have known that Robinson was sexually harassing Cunningham. We will first address the harassment that Cunningham alleges occurred while she was on line 75 (i.e., prior to the Hill investigation and Cunningham's denial of her earlier allegations). Cunningham claims that, at the time she requested a transfer from line 75, Anheuser-Busch should have known that Robinson was harassing her because (1) she reported some instances of Robinson's behavior to supervisors at the brewery, (2) management clearly was aware that Robinson was bothering her when they agreed to move her to a new line, and (3) management was aware that Robinson had previously harassed and threatened Chiandet, another female employee.

The district court discredited Cunningham's assertions that she had reported the harassment to her supervisors. Summary judgment, however, requires us to view all of the evidence in the light most favorable to Cunningham as the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). And even if her testimony on that matter is excluded, the brewery was on notice that Robinson had a history of sexual harassment and that he made life so "unbearable" for Cunningham that management agreed to move her to a new line. Although the brewery's knowledge of Robinson's past acts of harassment does not in and of itself demonstrate that management had knowledge that Robinson was harassing Cunningham, a jury could find, based on the additional facts discussed above, that the brewery had constructive knowledge of the harassment. *See Dees v. Johnson Controls World Servs., Inc.*, 168 F.3d 417, 423 (11th Cir. 1999) (holding that knowledge of prior acts of harassment can support a claim that the employer had constructive knowledge of later acts by the same employee).

The district court also determined, and the brewery now argues, that summary judgment on Cunningham's claim was appropriate in part because, during the investigation into Hill's allegations against Robinson, Cunningham denied that Robinson had harassed her. Although this fact casts a pall on Cunningham's credibility, and is relevant as to whether the brewery responded appropriately by not further investigating Robinson at that time, it is not relevant as to whether the brewery knew or should have known that Cunningham was being harassed months earlier, at the time she had requested a transfer from line 75. The inconsistences in Cunningham's allegations, in other words, go to the weight of her testimony, not its admissibility. Cunningham has, accordingly, presented a genuine issue of material fact as to whether the brewery knew or should have known that Robinson was harassing her at the time she requested a transfer from line 75.

### b.          *Brewery's notice that Robinson has harassed Hill*

There is no question that Anheuser-Busch had actual notice that Robinson was harassing Hill on line 75. Hill followed corporate policy by reporting the harassment to her supervisor and, based on Hill's allegations, the brewery launched an investigation into Robinson's behavior. Although a genuine issue of material fact remains as to what the managers at Anheuser-Busch knew about Robinson's involvement in the alleged act of setting fire to Hill's car, we will address this incident in the Part F., which discusses Hill's retaliation claim.

### 2.          *Appropriate employer response*

Because we have determined that Anheuser-Busch's knowledge of the harassment is a question for the jury, the appropriateness of summary judgment in Cunningham's and Hill's cases hinges on whether there is a genuine issue of material fact as to whether the brewery responded reasonably to their allegations of harassment. As we discussed earlier, employer liability in cases of coworker harassment is not derivative, but instead depends on the employer's "own acts or omissions." *Blankenship v. Parke Care Ctrs. Inc.*, 123 F.3d 868, 873 (6th Cir. 1997). An employer's response is unreasonable if it "manifests indifference or unreasonableness in light of the facts the employer knew or should have known." *Id.* at 873; *Ellerth*, 524 U.S. at 765. A response is generally

adequate, however, if it is "reasonably calculated to end the harassment." *Jackson v. Quanex Corp.*, 191 F.3d 647, 663-64 (6th Cir. 1999) (holding that the employer failed to prove that its actions were "a reasonable attempt to prevent and correct the problem of racially harassing behavior").

Cunningham and Hill contend that the evidence, when viewed in the light most favorable to them, raises a genuine issue of material fact as to whether Anheuser-Busch responded reasonably to their allegations of sexual harassment given that the brewery had reason to believe that Robinson was a serial harrasser. Anheuser-Busch counters by asserting that liability is precluded on both Cunningham's and Hill's claims because (1) the brewery had in place a well-publicized anti-harassment policy that both women acknowledged having copies of, and (2) its response to each individual complaint was sufficient.

Although the brewery's sexual harassment policy, which includes procedures for reporting harassment, is relevant to the question of whether Anheuser-Busch reasonably attempted to prevent harassment in the first instance, it does not absolve the brewery from liability if it knew or should have known about the harassing conduct yet failed to respond appropriately. An employer's responsibility to prevent future harassment is heightened where it is dealing with a known serial harrasser and is therefore on clear notice that the same employee has engaged in inappropriate behavior in the past. *See Ferris v. Delta Air Lines, Inc.*, 277 F.3d 128, 136 (2d Cir. 2001) (refusing to grant summary judgment to the employer where a genuine issue of material fact existed as to whether the company's failure to warn other employees was negligent due to its knowledge of the harasser's prior violent act); *Sharp v. City of Houston*, 164 F.3d 923, 931-32 (5th Cir. 1999) (affirming a jury finding that a company was liable for failing to adequately supervise a harrasser where the company has constructive knowledge of past complaints).

As one treatise aptly explains, "[t]he best anti-discrimination policy in the world will not help the employer who, rather than fulfill its duty to act on complaints about a serial harrasser, lets the known harrasser continue to injure new victims." Elizabeth Jubin Fujiwara & Joyce M. Brown, *Causes of Action for Post-Ellerth/Faragher Title VII Employment Sexual Harassment Claims*, § 53, (2008), *available at* 27 COA2d 1 (Westlaw). Because Robinson was a known serial harrasser, the brewery is liable if its response to Cunningham's or Hill's complaints demonstrates an attitude of permissiveness and was not reasonably calculated to end Robinson's pattern of harassment. *See Jackson*, 191 F.3d at 663, 666.

### a.          *Brewery's response to Cunningham*

Anheuser-Busch asserts that it had no knowledge that Cunningham was being harassed, so it had no responsibility to remedy the harassment. It also claims that, because of what it did know, it acted appropriately by removing Cunningham from line 75. A jury could find, however, that the brewery had constructive knowledge that Cunningham was being harassed. A genuine issue of material fact therefore exists as to whether, given that Anheuser-Busch knew that Robinson had previously harassed another female employee, its failure to investigate that harassment or to take additional steps designed to prevent future harassment manifested "indifference or unreasonableness in light of the facts." *See Blankenship*, 123 F.3d at 873. Summary judgment was therefore inappropriate as to Cunningham's claim.

### b.          *Brewery's response to Hill*

Anheuser-Busch argues that it responded appropriately to Hill's allegations by separating her from Robinson, launching a prompt investigation that included interviewing numerous employees, and sending Hill a letter at the conclusion of the investigation stating that retaliation would not be tolerated. The brewery points out that there were no witnesses who observed Robinson harassing Hill, that Robinson denied harassing Hill, and that Cunningham, who originally claimed that she herself had been harassed by Robinson, later recanted her allegations. Anheuser-Busch further notes

that the collective bargaining agreement between the union and the brewery requires good cause for termination and, in light of its unsuccessful attempt to have Robinson terminated after his harassment of Chiandet, management reasonably believed that it had insufficient evidence to discipline Robinson at the time of Hill's complaints. The brewery finally argues that the failure to discipline an employee with a prior record of harassment is not necessarily an inappropriate response, and that it satisfied its duty to respond when it moved Hill off of line 75.

Notwithstanding Anheuser-Busch's arguments, a jury could find that, in light of the brewery's knowledge that Robinson was a serial harasser, management acted inappropriately by repeatedly removing the victims of harassment from line 75 while failing to undertake more fundamental action, such as training, warning, or monitoring Robinson. Although some courts have indeed found that simply removing a harasser from the victim's work environment is sufficient to preclude liability, none of the cases cited by the brewery involved a serial harasser such as Robinson or the type of threatening behavior at issue in the present case. *See, e.g.*, *Scarberry v. ExxonMobil Oil Corp.*, 328 F.3d 1255, 1259-60 (10th Cir. 2003) (discussing an employer's response to first-time harassers); *Swenson v. Potter,* 271 F.3d 1184, 1195-98 (9th Cir. 2001) (concluding that the employer fulfilled its obligation to take prompt corrective action by separating the plaintiff and a first-time harasser).

Anheuser-Busch particularly relies on *Scarberry* for the proposition that separating the alleged harasser and the victim is sufficient to meet an employer's obligation to remedy the harassment. *See Scarberry*, 328 F.3d at 1259-60. But the company in *Scarberry* was far more proactive in dealing with alleged harassers than Anheuser-Busch. *See id.* The *Scarberry* court noted that ExxonMobil "took progressively more serious remedial action that not only ended harassment by specific employees, but was also reasonably calculated to demonstrate to all employees that its policy against sexual harassment would be enforced." *Id.* at 1256. Like Robinson, one accused harasser in *Scarberry* denied the allegations. ExxonMobil nonetheless took care to "individually counsel[]" the first-time offender regarding "inappropriate behavior and company policy regarding harassment" and to sternly warn him "that ExxonMobil would not tolerate harassment in the workplace nor retaliation as a result of the investigation." *Id.* at 1259. Management in *Scarberry* also sent a letter to another employee accused of harassment that clearly "reinforced the company's policies and concerns about harassment, warned him that supervisors would be closely monitoring his behavior, and informed him that he would be disciplined if other harassing acts could be substantiated and that notes pertaining to the investigation would be maintained on file." *Id.* at 1260.

Contrary to Anheuser-Busch's assertion, *Scarberry* does not stand for the proposition that simply separating the harasser and his victim is sufficient to preclude liability. Rather, it demonstrates that companies that take affirmative steps reasonably calculated to prevent and put an end to a pattern of harassment—such as personally counseling harassers, sending them letters emphasizing the company's policies and the seriousness of the allegations against them, and threatening harassers with serious discipline if future allegations are substantiated—are more likely to be deemed to have responded appropriately. *See Scarberry*, 328 F.3d at 1259; *see also Jackson v. Quanex Corp.*, 191 F.3d 647, 664 (6th Cir. 1999) (holding that reprimanding a supervisor who had a reputation for discriminating against African-Americans was insufficient by itself to prove that the company took reasonable steps to "prevent and correct" the harassment); *Fenton v. HiSAN, Inc.*, 174 F.3d 827, 831 (6th Cir. 1999) (holding that the employer's response was sufficient when, after the first complaint, the employer separated the parties, sternly warned the offending employee that he was to stop making offensive comments, and informed him that his failure to comply would result in disciplinary action); *Blankenship*, 123 F.3d at 870-71, 874 (holding that an employer's response was sufficient when, after the first complaint, management not only separated the employees, but (1) formulated an "observation network" designed to monitor the harasser, (2) checked with the victim daily to ensure that she had not been further bothered by the harasser, and (3) after further complaints, met with the harasser the next day to give him written notice that this was his "one and

only" warning, that further harassment would result in immediate termination, and that harassment "absolutely will not be tolerated").

The record before us does not reflect that the brewery took any remedial steps other than removing Hill from line 75. Anheuser-Busch alleges that "company policy" is to counsel alleged harrassers, so it likely counseled Robinson "as a matter of course." As Hill points out, however, there was no evidence in the brewery's employment files that anyone from Anheuser-Busch ever met with Robinson after the investigation was completed, let alone provided him with counseling or training. And deposition testimony from several managers at the plant contradicts Anheuser-Busch's assertions that Robinson was counseled after each allegation of harassment. Manley, the manager in charge of harassment investigations, admitted that there were no records of any meeting with Robinson and that brewery files on Robinson were "not in the condition" he expected them to be. Daniel Brown, a manager with overall responsibility for employees at the brewery, stated in his deposition that Robinson did *not* receive any counseling on sexual harassment as part of the investigation into Hill's complaints and that Robinson never received training "any different than every other employee receives."

There is also no evidence in the record that the management at Anheuser-Busch took any other corrective action reasonably calculated to end Robinson's pattern of  harassment—such as warning him that sexual harassment would not be tolerated or monitoring his behavior to ensure that he did not harass either Hill or other women at the plant. Strangely enough, the only letter in the record that expressed disapproval of Robinson's harassment was sent to *Hill*, not to Robinson, which obviously had no deterrent effect on the harasser.

Anheuser-Busch defends the steps it took by asserting that management could not have taken additional steps to discipline Robinson because he denied that he had ever harassed Hill. The brewery knew, however, that Robinson had a history of lying about harassing women. During its investigation into Robinson's harassment of Chiandet, Robinson denied authoring the threatening notes to her. He admitted writing the notes only after the brewery confronted him with evidence that he had been identified by a handwriting expert. This history calls into question Anheuser-Busch's assertion that Robinson's denial was entitled to significant weight and supports Hill's assertion that there is a genuine issue of material fact as to the appropriateness of Anheuser-Busch's response.

The brewery also argues that it did not take further action against Robinson because, under the collective bargaining agreement, it did not have free reign to fire him at will. Anheuser-Busch notes that it had attempted to fire Robinson after he harassed Chiandet, but was thwarted by the union grievance process. The brewery's inability to permanently discharge Robinson the first time that he sexually harassed an employee, however, does not excuse its failure to take appropriate action in response to subsequent incidents. Even if the brewery's determination that it had insufficient evidence to sustain a charge of harassment against Robinson in Hill's case was reasonable, that does not mean that it had no responsibility to take other remedial steps to ensure that Robinson did not harass other women.

The remedies of Title VII would be rendered impotent if employers dealing with serial harassers were allowed to throw up their hands after their first effort to deal with the harasser proved unsuccessful. A company faced with a pattern of harassment must both respond appropriately and take increasingly effective steps designed to end the harassment. The failure to do so suggests indifference and permissiveness on the part of management. This is not to say that a jury will necessarily determine that Anheuser-Busch's responded inappropriately. But Hill has raised a genuine issue of material fact as to whether the act of removing her from line 75 was by itself a reasonable remedy under the circumstances of this case.

**E.**     *Hawkins*

We need not address whether the harassment alleged by Hawkins was sufficiently severe or pervasive to survive summary judgment because we agree with the district court that Hawkins did not establish the other elements of her prima facie case. Although there is no question that Anheuser-Busch had actual notice that Robinson harassed Hawkins when she reported the incident to her manager at the first opportunity, Anheuser-Busch promptly launched an investigation, suspended Robinson, and then fired him. The brewery's response to Hawkins's complaint was markedly different from its response to the earlier complaints of Cunningham and Hill. We therefore agree with the district court's conclusion that the remedial steps taken by Anheuser-Busch after learning of Hawkins's harassment complaint were sufficient to preclude employer liability as to her claims.

**F.     Hill's and Jackson's retaliation claims**

In addition to Hill's hostile-work-environment claim, she asserts, along with Jackson, that Anheuser-Busch is liable for Robinson's alleged retaliation against them under Ohio Revised Code § 4112. Hill alleges that Robinson set fire to her car in retaliation for her filing a sexual harassment complaint against him. Jackson alleges that Robinson set fire to her house in retaliation for her participation in the investigation into Hawkins's complaint of harassment. Both women also allege that other coworkers were rude to them after they filed their complaints.

The district court dismissed Hill's and Jackson's retaliation claims after concluding that this circuit does not recognize employer liability for coworker retaliation. Applying the prima facie test for retaliation, the court also found that both women failed to allege any act by Anheuser-Busch that rose to the level of an adverse employment action. The court specifically noted that neither Hill nor Jackson presented any evidence that the brewery "condoned or encouraged" retaliatory acts by coworkers.

**1.     *Title VII's anti-retaliation provision***

In order to establish a prima facie case of retaliation under this court's Title VII caselaw, an employee must establish that (1) he or she engaged in protected activity, (2) the employer knew of the exercise of the protected right, (3) an adverse employment action was subsequently taken against the employee, and (4) there was a causal connection between the protected activity and the adverse employment action. *See Morris v. Oldham County Fiscal Ct.*, 201 F.3d 784, 792 (6th Cir. 2000). The Supreme Court in *Burlington Northern & Santa Fe Railway Co. v. White*, 126 S. Ct. 2405 (2006), however, made clear that the scope of Title VII's retaliation provision is broader than that of Title VII's discrimination provision. *Id.* at 2412-14; *see also* Civil Rights Act of 1964, §§ 703(a), 704(a), 42 U.S.C. §§ 2000e-2(a), 2000e-3(a). In contrast to Title VII's discrimination provision, the "adverse employment action" requirement in the retaliation context is not limited to an employer's actions that solely affect the terms, conditions or status of employment, or only those acts that occur at the workplace. *See Burlington Northern*, 126 S. Ct. at 2412-14. The retaliation provision instead protects employees from conduct that would have "dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* at 2415 (internal quotation marks omitted).

**2.     *Coworker-retaliation claims***

This circuit has not previously recognized a claim for coworker retaliation under Title VII. We have not, however, foreclosed the existence of such claims. *See Swanson v. Livingston County*, 121 F. App'x 80, 85 (6th Cir. 2005) (recognizing a cause of action for supervisor retaliatory harassment, but noting that this circuit has not "recognized co-worker retaliatory harassment as a valid cause of action"); *Little v. BP Exploration & Oil Co.*, 129 F. App'x 260, 262 (6th Cir. 2005) (same); *see also Patton v. Sears, Roebuck & Co.*, 234 F.3d 1269, 2000 WL 16181017, at *5 n.1 (6th Cir. 2000) (unpublished table decision) (noting that cases from other circuits holding an employer

liable for coworker retaliatory harassment were "persuasive," but having no need to decide the issue in the case before it).

The majority of our sister circuits to address this issue have determined that Title VII protects against coworker retaliatory harassment that is known to but not restrained by the employer. *See Moore v. City of Philadelphia*, 461 F.3d 331, 349 (3d Cir. 2006) (holding that an employer may be liable under Title VII for coworker retaliatory harassment); *Fielder v. UAL Corp*., 218 F.3d 973, 984-85 (9th Cir. 2000) (recognizing a claim for coworker retaliation based on the principle that employers are liable for coworker retaliation on grounds similar to the grounds on which they are liable for coworker harassment), *vacated on other grounds in light of Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002); *Richardson v. New York Dep't of Corrective Serv.*, 180 F.3d 426, 446 (2d Cir. 1999) (holding that "sufficiently severe" and "unchecked" retaliatory coworker harassment may constitute an adverse employment action); *Gunnell v. Utah Valley State Coll.*, 152 F.3d 1253, 1264-65 (10th Cir. 1998) (recognizing claims for coworker retaliatory harassment if the conduct is "sufficiently severe," the company had knowledge of the acts, and the company orchestrated, condoned, or encouraged them); *Knox v. Indiana*, 93 F.3d 1327, 1334 (7th Cir. 1996) (upholding a jury verdict after recognizing that a company may be held liable for retaliation through their acquiescence in a coworker's campaign of retaliatory harassment); *Wyatt v. City of Boston*, 35 F.3d 13, 15-16 (1st Cir. 1994) (explaining that an adverse employment action includes "toleration of harassment by other employees").

In contrast, the Fifth and the Eighth Circuits have rejected coworker retaliation claims by narrowly defining what constitutes an "adverse employment action" under Title VII. *See Manning v. Metropolitan Life Ins. Co.*, 127 F.3d 686, 692 (8th Cir. 1997) (refusing to recognize coworker retaliation "[a]bsent evidence of some more tangible change in duties or working conditions that constituted a material employment disadvantage"); *Mattern v. Eastman Kodak Co.*, 104 F.3d 702, 707 (5th Cir. 1997) (holding that an "adverse action" must be an "ultimate employment decision," such as hiring, compensating, promoting, granting leave, or firing, and that "[h]ostility from fellow employees, having tools stolen, and resulting anxiety, without more, do not constitute ultimate employment decisions, and therefore are not the required adverse employment actions"). But the Supreme Court in *Burlington Northern* specifically abrogated the reasoning in both *Manning* and *Mattern*, holding that the application of Title VII's retaliation provision is not limited to a narrow definition of an "adverse employment action" that includes only actions affecting the terms, conditions or status of employment. *See* 126 S. Ct. at 2414.

Nothing in the language of Title VII's anti-retaliation provision indicates that the principle of employer responsibility does not extend to claims for retaliation by coworkers. *See* Civil Rights Act of 1964, § 704(a), 42 U.S.C. § 2000e-3(a). In *Knox*, 93 F.3d at 1334, the Seventh Circuit held that there was no reason "why a different form of retaliation—namely, retaliating against a complainant by permitting her fellow employees to punish her for invoking her rights under Title VII— does not fall withing this statute." We agree. To hold otherwise would allow an employer to recruit or permit employees to carry out retaliatory acts with impunity. We therefore join the majority of our sister circuits that have addressed this issue in recognizing that, in appropriate circumstances, Title VII permits claims against an employer for coworker retaliation.

What remains to be determined is what those "appropriate circumstances" are. A review of the relevant caselaw in other circuits is helpful. In one of the first cases to address the issue, the Tenth Circuit determined that employers may be held liable for the retaliatory acts of coworkers if supervisory or management-level personnel "orchestrated, condoned, or encouraged" a coworker's actions, and management actually knew about the coworker retaliation. *Gunnell*, 152 F.3d at 1265.

The Eight Circuit, one of the two circuits that has addressed coworker retaliation after *Burlington Northern*, stated in dicta that the circuit may adopt a more stringent standard for coworker

retaliation. Although the court dismissed a coworker retaliation claim on other grounds, the court suggested that, in order to hold an employer liable for coworker retaliation, a plaintiff must demonstrate that the employer's failure take sufficient remedial action was *motivated* by the fact that the plaintiff engaged in protected activity. *Carpenter v. Con-Way Cent. Express, Inc.*, 481 F.3d 611, 619 (8th Cir. 2007). The Third Circuit, the other circuit to address coworker retaliation post-*Burlington Northern*, has taken a different approach. That court determined that an employer will be liable "if the prima facie case is satisfied and if there is a basis for employer liability for the coworker's conduct." *Moore v. City of Philadelphia*, 461 F.3d 331, 349 (3d Cir. 2006). To determine employer liability, the Third Circuit then looked to its coworker harassment caselaw as a model. It determined that, as with harassment, there is a basis for company liability for coworker retaliation "where supervisors knew or should have known about the [co-worker] harassment, but failed to take prompt and adequate remedial action" to stop the abuse. *Id.* at 350 (alterations in original) (internal quotation marks omitted).

The standard for employer liability regarding coworker harassment in this circuit is similar to the standard employed by the Third Circuit. In *Blankenship v. Parke Care Ctrs., Inc.*, 123 F.3d 868 (6th Cir. 1997), we held that when coworker harassment is at issue, an employer is liable "if its response manifests indifference or unreasonableness in light of the facts the employer knew or should have known." *Id.* at 873. This test seeks to advance the goals of Title VII while ensuring that employers are held liable for only their own indifferent or unreasonable behavior. *See id.* We see no reason why this standard will not prove equally effective in the context of coworker retaliation.

As *Burlington Northern* made clear, however, the tests for harassment and retaliation are not coterminous. The courts must evaluate whether the retaliatory act would "dissuade a reasonable worker from making or supporting a charge of discrimination" when determining whether an employer's response to coworker retaliation is indifferent or unreasonable. *Burlington Northern*, 126 S.Ct. at 2409. Taking into account our caselaw and the guidance provided by *Burlington Northern*, we hold that an employer will be liable for the coworker's actions if (1) the coworker's retaliatory conduct is sufficiently severe so as to dissuade a reasonable worker from making or supporting a charge of discrimination, (2) supervisors or members of management have actual or constructive knowledge of the coworker's retaliatory behavior, and (3) supervisors or members of management have condoned, tolerated, or encouraged the acts of retaliation, or have responded to the plaintiff's complaints so inadequately that the response manifests indifference or unreasonableness under the circumstances. *See Burlington Northern*, 126 S.Ct. at 2415; *Blankenship*, 123 F.3d at 872-73.

We must now determine whether Hill's and Jackson's claims survive summary judgment under this standard. As the district court noted, there is no question that both women engaged in protected activity. There is also no question that they allege that Robinson set the two fires in question in order to retaliate. We therefore turn our attention to evaluating whether (1) Robinson's actions were sufficiently severe to dissuade a reasonable worker from making or supporting a charge of discrimination, (2) Anheuser-Busch had knowledge of Robinson's retaliatory actions, and (3) management either condoned Robinson's actions or failed to adequately respond to the allegations of retaliation.

### a. Hill's retaliation claim

We conclude that Hill has alleged facts sufficient to survive summary judgment on her retaliation claim. There is no question that a jury could find that management at Anheuser-Busch knew about the allegations that Robinson had set fire to Hill's car in retaliation for her reporting him. Hill directly reported the fire to her supervisors, and senior management at the brewery knew about the anonymous letter specifically alleging that Robinson had not only set fire to Hill's car, but that he had threatened to "kill the bitch" if he lost his job.

Testimony given during a Licking County Prosecutor's Office investigation into the fire at Jackson's home is also telling. During the investigation, Eric Steinberg, Hill's and Robinson's supervisor at the brewery, acknowledged that around the time that Hill's car was set on fire, Robinson had insinuated to Steinberg that he had caused the fire. Steinberg's statements also reveal that he knew that Robinson was dangerous and that he feared that Robinson might harm him. He recounted that during one conversation with Robinson about Steinberg's marital problems, Robinson told Steinberg that he "ought to kill the bitch" and then offered to help Steinberg kill his wife. When Steinberg was later asked by the prosecutor's office if he would participate in an investigation into Robinson, he declined, stating that he did not want to get involved because Robinson might try to retaliate against him. Manley, a member of senior management at the brewery and the only manager involved in all three of the investigations into Robinson's behavior prompted by Chiandet's, Cunningham's, and Hill's allegations, revealed in his deposition that he was aware of rumors that Robinson had set fire to Hill's vehicle and that he knew that Hill had told supervisors that she believed that Robinson set fire to her car in retaliation for her complaint of harassment.

The same investigation also revealed that Robinson had told both Hawkins and Hudson that he was responsible for setting fire to Hill's vehicle. Although Steinberg, Hawkins, and Hudson did not relay this information to senior management, their testimony gives rise to an inference that Robinson's threatening behavior and violent acts of retaliation were common knowledge to both coworkers and supervisors at the brewery. Hill's allegations might therefore have been substantiated by a more complete investigation. Although the brewery correctly points out that Hill did not present direct evidence that Robinson was responsible for setting the fire, the deposition testimony from Steinberg is sufficient to raise a genuine issue of material fact as to whether management had knowledge of Robinson's involvement. This precludes summary judgment on that ground.

Anheuser-Busch has also failed to show that it responded to Hill's complaint of retaliation in any meaningful way. The two members of management to whom Hill reported the fire—Davidson and Schlarman—allegedly not only failed to investigate Hill's allegation that Robinson had retaliated against her, but chided her for attempting to make a report. The brewery never bothered to investigate the incident, monitor Robinson, or create a safe environment for harassment complaints. A jury could find that, given what management knew about the fire, the brewery had an obligation to investigate the incident.

Anheuser-Busch argues that its response was sufficient because it fully investigated Hill's allegations of harassment and notified her by letter that it would not tolerate retaliation. But the brewery fails to acknowledge that Hill's allegation that Robinson had set fire to her car in retaliation for reporting him was separate from her initial allegations of harassment on line 75. And despite the language in the letter to Hill stating that Anheuser-Busch did not tolerate retaliation, the brewery never bothered to investigate Hill's allegation that Robinson was continuing to harass her in retaliation for her report. The serious nature of Hill's allegation could lead a jury to find that failing to investigate the incident and issuing a letter solely to Hill, as opposed to Robinson, was an insufficient response.

There are, therefore, sufficient facts in the record upon which a jury could find that Anheuser-Busch's failure to investigate the complaint of Robinson's violent act of retaliation was both indifferent and unreasonable. *See also Patton v. Sears, Roebuck & Co.*, 234 F.3d 1269, 2000 WL 1681017, at *4-5 (6th Cir. 2000) (upholding a jury verdict for retaliation in part because the company failed to follow up and investigate the plaintiff's complaints of retaliation or to condemn coworker retaliatory harassment); 3 Arthur Larson & Lex K. Larson, Employment Discrimination § 87.20, at 17-101 (1994) (including the "toleration of harassment by other employees" as an example of a retaliatory adverse employment action). Summary judgment on Hill's claim of retaliation was therefore inappropriate.

### b. *Jackson's retaliation claim*

Jackson claims that Robinson retaliated against her for her participation in Anheuser-Busch's investigation into his harassment of Hawkins. Her claim raises the initial question of whether Jackson's participation in an internal company investigation regarding another employee is even protected by Title VII.

We recognize that the scope of Title VII's anti-retaliation provisions remains unsettled post-*Burlington Northern* and post-*Ellerth/Faragher*. The Supreme Court, in fact, has recently granted certiorari to address whether retaliation against an employee who participates in an internal investigation into the harassment of another employee, prior to any litigation or governmental involvement, is protected by Title VII. *See Crawford v. Metro. Gov't of Nashville & Davidson County*, 21 F. App'x 373, 375-77 (6th Cir. 2006), *cert. granted*, 75 U.S.L.W. 3663 (U.S. Jan. 18, 2008) (No. 06-1595) (holding that participation in an internal investigation into the alleged harassment of other employees without more does not give rise to protection under Title VII).

Because Jackson's claim would fail even if the protections of Title VII are determined to be applicable to her, we decline to address the scope of Title VII here. Even assuming for the sake of argument that Title VII applies, the brewery's handling of the threat of future retaliation against Jackson was sufficient to preclude liability. Anheuser-Busch undertook proactive steps to protect both Jackson and Hawkins from retaliation when it decided to fire Robinson, including coordinating with law enforcement to monitor Robinson, hiring a security guard to follow him, and offering Jackson the protection of a security guard at her home, which she refused.

Robinson's death unfortunately left Jackson with limited remedies for the damage that she suffered from the fire. This turn of events, however, does not alter the fact that summary judgment in favor of Anheuser-Busch was justified on Jackson's retaliation claim.

## III. CONCLUSION

For all of the reasons set forth above, we **AFFIRM** the district court's grant of summary judgment as to Hawkins's hostile-work-environment claim and as to Jackson's retaliation claim, but **REVERSE** the grant of summary judgment as to Cunningham's and Hill's hostile-work-environment claims and as to Hill's retaliation claim and **REMAND** the case for further proceedings consistent with this opinion.