NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 10a0146n.06

No. 09-5443

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
**Mar 09, 2010**
LEONARD GREEN, Clerk

| | | |
|---|---|---|
| LEONARD PERKINS, | ) | |
| | ) | |
| Plaintiff–Appellant, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| FRANCIS J. HARVEY, Secretary of the Army, | ) | COURT FOR THE WESTERN |
| | ) | DISTRICT OF TENNESSEE |
| Defendant–Appellee. | ) | |

Before:      KEITH, BOGGS, and GRIFFIN, Circuit Judges.

PER CURIAM.  Leonard Perkins appeals from a judgment of the district court dismissing his lawsuit on the defendant's motion for summary judgment.  Perkins alleges that his employer, the Army Corps of Engineers, discriminated against him because he was African–American by failing to give him opportunities to work as a cook on two of its motor vessels.  Perkins further alleges that the actions of various of his coworkers created a hostile work environment, and were retaliations for his filing discrimination complaints.  Because Perkins has not provided evidence sufficient to raise a genuine issue of material fact that the individuals selected to fill the positions he wanted were similarly situated to him, nor that the actions of his coworkers were either based on his race or motivated by his discrimination complaints, we affirm the judgment of the district court.

**I**

Leonard Perkins ("Perkins"), who is African–American, was a civilian employee of the Army Corps of Engineers ("ACoE") from 2000 until 2007. At all times relevant to this appeal, he was employed aboard the *Hurley*, a dredge based in Memphis, Tennessee. Because the *Hurley* is inactive during the winter months, Perkins was a seasonal employee; nevertheless, he was considered a permanent employee of the ACoE, and was a "federal employee" as defined in 5 U.S.C. § 2105. From 2000 to 2004, Perkins held the job of "shipkeeper," which he describes as being roughly analogous to that of a housekeeper: he cleaned, scrubbed toilets, washed down showers, made beds, vacuumed, and assisted the ship's cooks in the galley.

In August 2004, a vacancy was announced for one of the *Hurley*'s three Cook positions, and Perkins formally applied for the job. The vacancy was considered a "competitive promotion," and the procedure for filling it called for the candidates' applications to be forwarded to Fort Riley, Kansas, where staff at the Civilian Personnel Operations Center developed a list of qualified candidates from which the Memphis District Selecting Official chose a selectee. In November 2004, Perkins's application was selected and he was promoted to Cook. As a result, Perkins went from a "Grade 6" employee, making $16.82 per hour, to a "Grade 8" employee, making $17.48 per hour.

Between August and November 2004, however, before the final selection was made, the Cook position was temporarily filled by two white contract employees while the process for deciding on a permanent candidate went forward. The contract cooks were employees of FedSource, a personnel agency, and were not federal employees under 5 U.S.C. § 2105. Perkins alleges that the *Hurley*'s Captain, Rick Niday, told him that he "didn't have time to process the paperwork" to appoint Perkins to the temporary position, and thus denied him the opportunity to work as a cook

until his permanent promotion took effect in November. As a result of this denial, Perkins alleges that he suffered a loss of pay (both from the lesser hourly rate and the relative lack of overtime opportunities), and that the stress and humiliation he felt during the week the contractors came aboard caused health problems that included elevated blood pressure and blood sugar, as well as a hemorrhage in his left eye that required surgery.

At about the time Perkins received his promotion in November 2004, the *Hurley* entered its "off-season." In April 2005, while the *Hurley* was still inactive, Perkins learned about and attempted to acquire a two-week temporary position as a cook on the ACoE motor vessel *Mississippi*. Again, however, the position was filled by white temporary workers supplied by FedSource. Perkins alleges that the Captain of the *Mississippi*, Tim Milum, told him that the vessel was in Vicksburg, MS and that "it would be more convenient to pick up another man already in Vicksburg," but that he later learned that the *Mississippi* had actually been in Tunica, MS, much closer to Perkins's home in Memphis.

When the *Hurley* resumed its seasonal dredging operations for 2005, Perkins was one of its three cooks. Although he was in the position he had applied for the previous year, however, he alleges that he began to have "increasingly hostile" interactions with certain of his coworkers. Specifically, he alleges that, between July 11 and July 27, 2005:

- John Boyd "wanted to physically fight" him

- Curtis Williams, a shipkeeper, cursed at him and, on one occasion, failed to ring the ship's wake-up bell outside his quarters, causing him to oversleep and forcing him to use an hour and a half's leave time so that he would not be declared absent without leave

• James Trice, another shipkeeper who worked under Perkins's supervision, cursed at him, acted belligerently, and refused on one occasion to clean a steam table when told to so do by Perkins

• Joe Shaffer told him that Shaffer did not believe in filing lawsuits or EEO complaints

• On one occasion, the *Hurley* departed from its boat landing earlier than usual, and no one had informed Perkins of the change, causing him to miss the departure and wait two hours before he could be picked up.

Perkins alleges that he informed his superiors, including Captain Niday, of these events, but that no corrective action was ever taken.

Perkins makes no allegations as to hostile interactions with his coworkers after July 27, 2005. He does, however, allege that he was turned down for yet another temporary assignment in July 2006, this time for a dredge equipment operator's position.[1] At the time, candidates for a permanent dredge equipment operator were being considered, and Captain Niday had made it known that anyone with deck experience could fill in on a temporary basis until the permanent selection was made. Perkins, who had no deck experience, worked briefly as a deckhand so that he could qualify for the dredge equipment operator, but the temporary position was instead given to Randy Sanderson. Sanderson, a white man, had been a boat operator and a third mate until being caught with drugs, sent to rehab, and returned to an administrative position; hence, he was qualified to perform the dredge equipment operator's function on a temporary basis.

As a result of these events, Perkins filed a total of four formal complaints of discrimination with the Department of the Army's Equal Employment Opportunity ("EEO") office. The first three,

---

[1]In total, Perkins appears to have applied for 276 positions between 2000 and 2007.

which pre-dated his initial complaint at the district court, involved the denial of his request to work the four-month temporary cook's position aboard the *Hurley*, the denial of his request to work the two-week temporary cook's position aboard the *Mississippi*, and his perceived mistreatment by his coworkers, respectively, and each complaint was subsequently denied. He then timely filed a complaint with the district court on May 25, 2006, alleging violations of Title VII in that (1) he had been discriminated against because of his race and age,[2] including in the creation of a hostile work environment, and (2) he had been retaliated against because of his decision to file complaints with the Equal Employment Opportunity office. On September 7, 2006, he filed a fourth complaint with the EEO office alleging that his non-selection for the dredge equipment operator position was due to race discrimination and reprisal. When that claim, too, was denied, Perkins amended his district court complaint on April 30, 2007 to include those allegations.

The district court granted summary judgment to the defendant on March 11, 2009. This timely appeal followed.

**II**

We review a district court's grant of summary judgment de novo. *Int'l Union v. Cummins, Inc.*, 434 F.3d 478, 483 (6th Cir. 2006). We will uphold such a grant "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In considering a motion for summary judgment, we must view

---

[2]Perkins's attorney later disclaimed the age discrimination allegations at Perkins's deposition. They are not argued in his brief on appeal.

the inferences to be drawn from the underlying facts in favor of the non-moving party, in this case the plaintiff. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The papers supporting the movant are closely scrutinized, whereas the opponent's are indulgently treated. *Bohn Aluminum & Brass Corp. v. Storm King Corp.*, 303 F.2d 425, 427 (6th Cir. 1962). The central issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

### III

Perkins's first argument on appeal is that the district court erred in holding that he was unable to establish a prima facie case of discrimination with respect to the ACoE's failure to select him for the two cook positions. We disagree.

In order to recover under a disparate treatment theory of employment discrimination, a plaintiff must demonstrate that he was treated less favorably than others by his employer because of his race, color, religion, sex, or national origin. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 796 n.4 (1973) (citing 42 U.S.C. § 2000-2(a)(1)). *McDonnell Douglas* established the now-familiar framework for such claims as first requiring the plaintiff to establish a prima facie case of racial discrimination, after which the employer receives the opportunity to articulate a legitimate nondiscriminatory reason for its actions. *Russell v. Univ. of Toledo*, 537 F.3d 596, 604 (6th Cir. 2008). If the employer can articulate such a reason, the plaintiff must then show that the stated reason was in fact pretextual. *Ibid*.

No. 09-5443
Perkins v. Harvey

The burden of establishing a prima facie case of disparate treatment is not onerous. *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981). Where, as in this case, a plaintiff lacks direct evidence of discriminatory intent such as an explicit statement that he was not hired because he was black, a plaintiff may establish a prima facie case of discrimination through the use of circumstantial evidence by showing that (1) he is a member of a protected class, (2) he applied for and was not hired for a job, (3) he was qualified for the job, and (4) a similarly-situated person who was not in the plaintiff's protected class was hired for the job.[3] *Seay v. Tenn. Valley Auth.*, 339 F.3d 454, 463 (6th Cir. 2003). In this case, it is undisputed that Perkins, as an African–American, was a member of a protected class; similarly, no argument has been made that he was not qualified for the positions for which he applied. Moreover, though the appellee does note that Perkins's "applications" for the jobs he sought were more in the nature of informal verbal requests, he does not present a developed argument that Perkins failed to offer sufficient proof with respect to this element to survive summary judgment. The question with respect to Perkins's claim, therefore, is whether the white employees that were hired for the positions he sought were "similarly situated" to him.

---

[3]Arguably, Perkins's claim could also be cast as one that he was not promoted, rather than one that he was not hired. The standard for a prima facie case in a failure-to-promote claim requires a showing that (1) the employee is a member of a protected class, (2) he applied and was qualified for promotion, (3) he was considered for and denied promotion, and (4) another employee of similar qualifications who was not a member of the protected class received promotion. *Sutherland v. Mich. Dep't of Treasury*, 344 F.3d 603, 614 (6th Cir. 2003). Perkins himself characterizes this as a failure-to-hire case, and there is no material difference between the standards on these facts.

To establish that an employee is similarly situated to a plaintiff, "the plaintiff [must] demonstrate that he or she is similarly situated to the [claimed comparator] in all *relevant* respects." *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 353 (6th Cir. 1998) (emphasis in original). In evaluating a proposed comparator, courts "should make an independent determination as to the relevancy of a particular aspect of the plaintiff's employment status and that of the non-protected employee." *Id.* at 352.

The district court concluded that the individuals who were hired for the cook jobs that Perkins wanted were not similarly situated to Perkins, because they were temporary, non-government employees.[4] As the record indicates, these employees were supplied by FedSource and did not have "federal employee" status under 5 U.S.C. § 2105.

Perkins all but concedes his inability to make out a prima facie case with respect to the two Cook positions by arguing that "[w]hile the rights, privileges and benefits of employment are relevant to whether employees are similarly situated for temporary positions . . . this should not be the end of the analysis." Perkins goes on to argue that we should also consider whether the proposed comparators would put forth "equal skill, effort, and responsibility," and "perform[] under similar working conditions." *See Russell v. Drabik*, 24 F. App'x 408, 413 (6th Cir. 2001). Yet a disparate treatment plaintiff cannot treat relevant points of comparison as a type of balancing test; as

---

[4]With respect to the 2006 decision not to offer Perkins a job as a dredge equipment operator, the district court held that the proposed comparator was not similarly situated because he was more qualified for the position than Perkins. Although Perkins does include in his brief a discussion of the factual basis for his EEO complaint about that decision, he does not argue on appeal that the denial of his dredge equipment operator application was racially discriminatory or retaliatory.

*Ercegovich* notes, the similarity must exist in *all* relevant respects. Hence it is irrelevant whether Perkins's proposed comparators would have exercised the same skills, efforts, and responsibilities, under the same conditions, if their rights, privileges, and benefits were different. Indeed, the panel in *Russell* discussed the question of whether a particular comparator would exercise equal skill, effort, and responsibility only *after* eliminating two other proposed comparators on the basis of the fact that they were unclassified state employees rather than, as the plaintiff herself was, a classified (i.e. tenured) employee. *Ibid.* In so doing, the court noted that "[a]s a matter of law, classified (tenured) and unclassified (untenured) employees are not similarly-situated." *Ibid.*

Because the rights, privileges, and benefits conferred on Perkins by virtue of his status as a federal employee were relevant points of difference from the candidates that eventually obtained the positions at issue, Perkins was not "similarly situated" to those candidates and cannot establish a prima facie case of disparate treatment.

**IV**

Perkins next alleges that his coworkers' behavior between July 11 and 27, 2005, was sufficient to constitute a hostile work environment. Again, we disagree.

Hostile-work-environment claims "involve[] repeated conduct" and require the plaintiff to demonstrate that "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe and pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115–16 (2002). In order to survive a motion for summary judgment, a plaintiff making such a claim must establish that (1) he is a member of a protected class, (2) he was subjected to harassment, either

through words or actions, based on the characteristic that defines the protected class, (3) the harassment had the effect of unreasonably interfering with the plaintiff's work performance and creating an objectively intimidating, hostile, or offensive work environment, and (4) there exists some basis for liability on the part of the employer. *See Grace v. USCAR*, 521 F.3d 655, 678 (6th Cir. 2008) (applying standard to claim of hostile work environment based on sex).

The Supreme Court has provided a non-exhaustive list of factors to consider when deciding whether a hostile work environment exists, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993). Further, courts must determine whether the "workplace is permeated with 'discriminatory intimidation, ridicule, and insult,' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Id.* at 21 (internal citations omitted). However, "the work environment as a whole must be considered rather than a focus on individual acts of alleged hostility." *Bowman v. Shawnee State Univ.*, 220 F.3d 456, 464 (6th Cir. 2000).

As evidence of a hostile work environment, Perkins points primarily to the actions of four of his coworkers. According to Perkins, John Boyd became resentful of his attempts to obtain a promotion and "wanted to actually fistfight with" him. Curtis Williams, meanwhile, "would curse at Perkins," and allegedly once intentionally failed to ring the ship's "wake-up bell" in front of Perkins's quarters, causing Perkins to be late for his shift (which resulted in Perkins's forced use of sick time). James Trice, who worked under Perkins, on one occasion became angry and

insubordinate when asked to clean a steam table. Finally, another of Perkins's shipmates, Joe Shaffer, told him that "the filing of lawsuits and EEO complaints is something that he didn't believe in."

The most fundamental problem with the allegations Perkins makes with respect to these individuals is that they fail to establish that the complained-of actions were based on Perkins's race. None of the allegations made by the appellant contain any hint of facts that would permit a rational factfinder to infer that racial animus played a part in what appear to have been garden-variety personality conflicts between people living and working in close quarters.[5]

Although he makes no mention of it in his brief, Perkins's deposition testimony comes closest to establishing a link between his race and the actions of his coworkers when he testifies that

> I think that Mr. Boyd, based upon what I have gathered in sharing living quarters with him over the years, is the type of individual that would think that it would be horrible for me to—for me to buck in any kind of way against white folk. I think that that potentially would make him angry.

This appears to be pure supposition on Perkins's part, however, and he points to no language used by Boyd (or any other factual evidence) to make the necessary connection between Boyd's actions and Perkins's race. Moreover, though Perkins's brief characterizes Boyd as extremely aggressive and "want[ing] to actually fistfight with him," the factual basis for this claim seems to have been a single episode with no apparent connection to Perkins's race. At one point in his deposition testimony, Perkins testified that

---

[5]The appellee alleges that Boyd, Williams, Shaffer, and Trice are all African–American, but the record appears to be silent on this point except in the case of Trice.

> Mr. Boyd came to me, in my face, and asked me if I had a problem with him. And if I've got a problem with him, would I like to do something about it right now.
> And he was exhibiting all the posture that you would expect in somebody when they wanted to engage you in a street fight.

The record does not indicate how that particular incident was resolved. Later in his testimony, however, Perkins makes clear that Boyd never explicitly threatened him physically, but rather that it is Perkins's understanding that Boyd expressed anger toward Perkins to a different coworker:

Q.    Did Mr. Boyd ever threaten you with bodily harm?

A.    He never spoke it to me. He never spoke it to me. But he told Larry Douglas, and that's according to Larry, you'll have to ask Larry about that, that he'd like to bust my head wide open.

Thus the extent to which Perkins's own interactions with Boyd were "physically threatening or humiliating" would seem to be significantly less than his brief implies. Moreover, Larry Douglas's statement that Boyd threatened to "bust [Perkins's] head wide open" is hearsay and inadmissible at summary judgment. *See Smoot v. United Transp. Union*, 246 F.3d 633, 649 (6th Cir. 2001).

Perkins's brief also alludes to statements he made during his deposition to the effect that the ship on which he served was a "floating plantation." This characterization apparently stems from the fact that the ship's Captain, first mate, and second mates are all Caucasian, and that "the radios on the boat, the walkie-talkies, are carried by whites generally speaking. So when it comes to the gravity of power on the boat, it's most like a plantation." These statements, however, are entirely conclusory and appear to be completely divorced from the actions that Perkins alleges to have been harassment.

**V**

Perkins's final argument is that he suffered illegal retaliation from his coworkers for his filing of EEO claims. This claim fares no better than the others.

In order to establish a prima facie case of retaliation under this court's Title VII caselaw, an employee must establish that (1) he or she engaged in protected activity, (2) the employer knew of the exercise of the protected right, (3) an adverse employment action was subsequently taken against the employee, and (4) there was a causal connection between the protected activity and the adverse employment action. *See Morris v. Oldham County Fiscal Ct.*, 201 F.3d 784, 792 (6th Cir. 2000). The Supreme Court has made it clear that Title VII's retaliation provision protects employees from conduct that would have "dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53, 60 (2006).

We have recently joined several of our sister circuits in holding that "retaliating against a complainant by permitting her fellow employees to punish her for invoking her rights under Title VII . . . fall[s] within this statute" in appropriate circumstances. *Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 346 (6th Cir. 2008) (quoting *Knox v. Indiana*, 93 F.3d 1327, 1334 (7th Cir. 1996)). *Hawkins* held that, in order to establish liability on the part of an employer for a coworker's retaliatory conduct, a plaintiff must demonstrate that (1) the coworker's retaliatory conduct was sufficiently severe so as to dissuade a reasonable worker from making or supporting a charge of discrimination, (2) supervisors or members of management have actual or constructive knowledge of the coworker's retaliatory behavior, and (3) supervisors or members of management have condoned, tolerated, or encouraged the acts of retaliation, or have responded to the plaintiff's

- 13 -

complaints so inadequately that the response manifests indifference or unreasonableness under the circumstances. *Id.* at 347.

Perkins's factual allegations, even if taken as true, fail to make out a case of coworker retaliation under Title VII. Under the *Hawkins* standard, the conduct at issue must be *retaliatory* conduct, not merely uncivil or even abusive behavior by itself. Thus, the plaintiff must have produced some evidence that the complained-of actions were motivated by the exercise of his protected right. With that in mind, it is significant that—even indulging all inferences in his favor—Perkins simply presents no evidence that coworkers Curtis Williams, James Trice, or John Boyd were even aware that he had filed complaints, let alone that the actions Perkins deems retaliatory were motivated by those complaints. Certainly, in the case of Boyd, Perkins testified that he first had problems with him "when I went on my journey, trying to get upgraded into that department to be what he was." While Perkins does not give a date for his first altercation with Boyd, it appears from his testimony that Boyd at one point attempted to scuttle Perkins's attempts to obtain a Cook's position by telling the vice president of their union that Perkins had previously lied about needing time off because of an eyesight problem. This led to Perkins's filing a lawsuit against Boyd, which seems to have led directly to Boyd's aggressiveness in the incident in which Boyd was "in [Perkins's] face, and ask[ing] if [Perkins] had a problem with him." Perkins's difficulties with Boyd seem therefore to have been in the nature of a personality conflict, not retaliation for Perkins's protected activities.

The actions of Perkins's other coworkers are even less connected to his claim. According to Perkins's deposition testimony, he had exactly one confrontation with James Tice, which

amounted to a dispute over cleaning responsibilities in the galley and for which Tice later apologized. Curtis Williams's cursing at him appears to have been a similar episode. The one coworker whom Perkins specifically alleges to have had knowledge of Perkins's complaints, Shaffer, appears to have been merely expressing an opinion. Perkins claimed that Shaffer "only just spoke to me in a conversation by saying that the filing of lawsuits and EEO complaints is something that he didn't believe in." Even if we were to consider Shaffer's statements "retaliatory," this simple disagreement, standing alone, is not one that is "sufficiently severe so as to dissuade a reasonable worker from making or supporting a charge of discrimination."

**VI**

For the reasons discussed above, we **AFFIRM** the judgment of the district court.