NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 14a0713n.06

No. 13-1890

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
Sep 10, 2014
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| KATHLEEN WIERENGO, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE |
| AKAL SECURITY, INC., | ) | WESTERN DISTRICT OF |
| | ) | MICHIGAN |
| Defendant-Appellee. | ) | |
| | ) | |

BEFORE: GIBBONS, SUTTON, and WHITE, Circuit Judges.

**JULIA SMITH GIBBONS, Circuit Judge**. Kathleen Wierengo formerly worked as a court security officer for Akal Security, Inc. After Akal fired her, Wierengo sued under Title VII alleging that Akal discriminated against her on the basis of sex, subjected her to a hostile work environment, and retaliated against her after she filed an internal grievance and EEOC complaint. The district court granted Akal's motion for summary judgment. We affirm.

**I.**

Akal is a private security company that frequently contracts with the U.S. Marshals Service. As part of one such contract, Akal provides security at the federal building and courthouse in Grand Rapids, Michigan.

In 2002, Akal hired Wierengo as a court security officer (CSO) at the Grand Rapids courthouse. Before coming to Akal, Wierengo worked as a police officer for the City of Grand

Rapids for twelve years. She also worked in various capacities at a variety of other businesses, including owning a rental and insurance business, managing an asphalt paving company, owning a cleaning business, and running a Chinese food take-out business.

Wierengo remained in the position of CSO throughout her time with Akal. She says that Akal refused to promote her nine times because she was a woman. Akal responds that Wierengo either never applied for the promotions or was insufficiently qualified for the positions. In 2005, Akal assigned Wierengo to the courthouse's security control room. There, Wierengo worked under site supervisor Robert Czarnecki and lead security officer Jerry Blumenstein. She also worked with Ted Quist, a fellow CSO. Most of Wierengo's lawsuit concerns various actions taken by these Akal employees.

Throughout Wierengo's time in the control room, Blumenstein made unwelcome comments. For example, Blumenstein complained if coffee was not ready in the morning, and he repeatedly told Wierengo that making coffee was her responsibility. And he once said to her, "Since you don't have anything to do, you need to dust the office." He also told her that her car was "ratty," that her hair was "ratty" and "looked like hell," and that one of her purses "looked like hell."

In April 2006, Czarnecki placed a copy of a 1955 *HouseKeeping Monthly* article in Wierengo's drawer and posted it on the board in the CSO break room. The article was titled "The Good Wife's Guide" and offered the following advice:

- Be happy to see [your husband].
- Listen to him . . . . Let him talk first—remember, his topics of conversation are more important than yours.
- Arrange his pillow and offer to take off his shoes. Speak in a low, soothing and pleasant voice.
- Don't ask him questions about his actions or question his judgment or integrity. Remember, he is the master of the house and as such will always

> exercise his will with fairness and truthfulness.  You have no right to question
> him.

Czarnecki highlighted the article's final point—"A good wife always knows her place."

Wierengo testified that Czarnecki and Blumenstein would often repeat similar sentiments to her.

Seven months later, Quist made an unwelcome physical advance.  According to Wierengo:

> [O]ut of nowhere [Quist] pinned my body up against the drawer with his body.  I
> was unable to move forward or backward because I was pinned so tight.  [Quist]
> then tried to kiss me on the mouth so I turned my face . . . into the drawers so he
> started to kiss me on my left cheek.  While he was kissing my cheek I was trying
> to pry my body out, but was unable to because I was pinned down so tight. . . .
> After [Quist] finished kissing on me he stepped back and stated "it's only a
> birthday kiss."

Wierengo submitted her first grievance on December 19, 2006.  In it, she stated that she was submitting a grievance because she was "past [sic] over for three (3) supervisor positions for which I am qualified.  I need to know why I did not receive any of these positions."  She did not mention or allege sexual harassment.  Wierengo first complained to a manager about the alleged sexual harassment on February 22, 2007.  Her letter did not identify the alleged harassers or specify the nature of the harassment.  It referred to her December 2006 grievance, stated for the first time that the "grievance involves both Job Discrimination and Sexual Harassment," and stated that she had not received a response.  The record reflects that Akal tried to talk to Wierengo at least two times about her grievance, but Wierengo refused to talk with the company.  Instead, Wierengo filed an EEOC sexual-harassment charge on March 12, 2007.  The charge did not identify the alleged harassers or Quist's physical attack.  It stated that she had been subjected to sexual harassment in "the form of being told to make coffee, that the place needed dusting, that a woman's place is to make her man's meals and clean and comments made about my purse,

to name a few." She also stated that she had applied for numerous promotions but less-qualified males were promoted instead. (*Id.*) Akal received a copy of the charge on April 2, 2007.

Wierengo did not tell anyone about Quist's advance until March 30, 2007—almost five months after the fact. The day after it heard about Wierengo's allegations, Akal transferred Quist to another building and told him not to contact Wierengo. Three weeks later, Akal interviewed Wierengo about the advance. In this interview, Wierengo told Akal that Quist still parked in the same parking lot as she did. Wierengo reported that one time Quist had stared at her in the parking lot and had tried to block her path as she was exiting. Akal immediately told Quist to park in a different garage.

After hearing that Wierengo was crying at work while carrying a loaded gun, Akal placed her on a paid leave of absence while her complaints were being investigated. Akal then sent an investigator to conduct additional interviews. The investigator interviewed over twenty people. Quist "continued to stress his innocence" and told the investigator that he had merely given Wierengo a "platonic hug on her birthday." The investigator concluded that Wierengo's sexual assault and sexual harassment claims were unsubstantiated.

On June 1, 2007, Akal told Wierengo she could return to work. Akal reassured Wierengo that even though it could not substantiate her allegations, it had made Quist's transfer permanent, barred him from using the parking lot, and required him to review its anti-harassment policy. Akal also conducted a mandatory harassment-prevention training session with all the CSOs.

According to Wierengo, "the daily environment was intolerable" when she returned to work. Two months later, Wierengo wrote Akal about "a progression of deteriorating professional conduct by fellow employees." Wierengo noted that several employees were "shunning" her and that she suspected it was in retaliation for her grievance petition. Akal asked

for more information. In response Wierengo listed several times when coworkers and supervisors left rooms immediately after she entered them or left rooms after finding her in them. After receiving this letter, Akal did not continue its investigation.

Akal did, however, investigate a complaint made against Wierengo by thirteen of her male coworkers. They complained that "Wierengo caused a hostile working environment for all of the other officers because of her 'constant note taking and stand-off attitude.'" They felt Wierengo was "posturing herself to file a civil action against the company as well as the majority of her coworkers." Akal did not tell Wierengo about this complaint, and its investigator did not interview her.

Wierengo wrote Akal again on December 6, 2007. She said that "[t]he Retaliation through Shunning continues by both my Supervisors and Fellow CSO's and has grown progressively worse. . . . Also, my supervisors are not informing me of pertinent information concerning the safety and well being of myself and others . . . ." Wierengo's letter did not provide any details regarding her concern about "safety," but in an affidavit prepared in response to Akal's motion for summary judgment she described an August 13, 2007, incident when a prisoner threatened to shoot a CSO. Although Blumenstein warned other CSOs about the threat, he did not tell Wierengo, who was in the control room at the time.

On December 18, 2007, twelve days after Wierengo's last letter, Wierengo asked to leave work early for an appointment. Her replacement arrived late, so she rushed out of the room. Accounts about what happened next vary. Akal says that Wierengo intentionally bumped into another CSO on her way out of the control room. She then rushed into the public lobby, shouting obscenities. Wierengo denies Akal's version of the incident, maintaining that she did not touch the other CSO or use offensive language in the lobby.

The U.S. Marshals Service asked Akal to investigate. As part of that investigation, Wierengo gave a recorded statement to the investigator. In her statement, she said it was "possible" her shoulder brushed against the replacement CSO. And when asked if she yelled obscenities in the lobby, Wierengo responded, "I don't know." After reviewing security camera footage and conducting more interviews, Akal's investigator concluded that Wierengo probably ran into the replacement CSO with her shoulder and that she shouted obscenities in a public part of the courthouse.

After reviewing the report, Akal's Vice President of Human Resources, Janet Gunn, decided that Wierengo should be suspended for five days, and recommended such action to the U.S Marshals Service. The U.S. Marshals Service disagreed with Gunn's recommendation and directed that Wierengo "be immediately and permanently remove[d] . . . from performance under this contract." Because Akal did not have another court security contract in Michigan, Akal fired Wierengo. Wierengo appealed, and in her letter submitting Wierengo's appeal to the U.S. Marshals Service, Gunn stated that Akal stood by its recommendation that a five-day suspension, rather than termination, would be an appropriate response to Wierengo's failure to meet performance standards. The U.S. Marshals Service denied Wierengo's appeal.

Wierengo sued Akal, bringing claims of sex discrimination, hostile work environment, and retaliation under state and federal law. After discovery concluded, Akal moved for summary judgment. The district court granted Akal's motion. Wierengo now appeals.

**II.**

We review a district court's grant of summary judgment *de novo*. *Allstate Ins. Co. v. Thrifty Rent-A-Car Sys., Inc*., 249 F.3d 450, 453 (6th Cir. 2001). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the

movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of showing that there is an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). In deciding motions for summary judgment, we draw all reasonable inferences in favor of the nonmovant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "The ultimate inquiry is 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Phillips v. Roane Cnty.*, 534 F.3d 531, 538 (6th Cir. 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986)).

On appeal, Wierengo challenges the district court's grant of summary judgment on each of her claims. We consider each in turn.[1]

### III.

Wierengo argues that Akal discriminated against her on the basis of sex when it passed her over for nine promotions. There are two types of Title VII discrimination claims: disparate treatment and disparate impact. *Huguley v. Gen. Motors Corp.*, 52 F.3d 1364, 1370 (6th Cir. 1995). Disparate treatment is present when an employer treats an employee less favorably than others because of the employee's race, religion, or sex. *Id.* Disparate impact happens when an employer's facially neutral employment practice has a disproportionately negative effect on a protected group of people. *Id.*

Although Wierengo argues both theories on appeal, we consider only Wierengo's disparate-treatment claim. Wierengo relied on a disparate-treatment theory of the case before the

---

[1] Akal moved for summary judgment on Wierengo's federal- and state-law claims. Wierengo did not discuss her state-law claims in her response brief, and the district court held that they were abandoned. We agree. *See Brown v. VHS of Mich., Inc.*, 545 F. App'x 368, 372 (6th Cir. 2013).

district court. She repeatedly alleged in her complaint that Akal intentionally refused to promote her because she was a woman; nowhere did she assert that she lost out on the promotions as a result of a neutral practice. *See Reminder v. Roadway Exp., Inc.*, 215 F. App'x 481, 485 (6th Cir. 2007). Likewise, in response to Akal's motion for summary judgment, Wierengo only made arguments based on disparate treatment. Wierengo cannot add new claims on appeal. *See Bridgeport Music, Inc. v. WM Music Corp.*, 508 F.3d 394, 400 (6th Cir. 2007).

In support of her disparate-treatment claim, Wierengo offers only her affidavit, which states:

> I was either passed up or never given the opportunity to apply for 8–9 promotions as follows:
>
> Promotion #1: After LCSO [Lead Court Security Officer] Bayne retired, CSO Czarnecki announced that he would be LCSO. There was no posting for this promotion. (2004).
>
> Promotion #2: CSO Czarnecki announced that CSO Blumenstein will be Assistant LCSO. There was no posting for this promotion. (2004).
>
> Promotion #3: CSO Larry Nyquist was promoted to lead CSO for new Bankruptcy Court. There was a posting for this position in the Fall 2005, Plaintiff applied; CSO Nyquist was given the promotion 6 months earlier. (2005)
>
> Promotion #4: CSO Czarnecki was promoted to site supervisor. There was no posting for this position. (2005)
>
> Promotion #5: CSO Blumenstein was promoted to LCSO. There was no posting for this job.
>
> Promotion #6: CSO Cuperus is promoted to Assistant LCSO. There was a posting, Plaintiff applied for this position. (2006)
>
> Promotion #7: CSO Bolden is promoted to Assistant LCSO at the Bankruptcy Court. There was no posting. Plaintiff applied for this position. (2006)
>
> Promotion #8: Assistant LCSO Cuperus is promoted to Site Supervisor. (2006) There was a posting and Plaintiff applied. (2006)

Promotion #9: CSO Quist is promoted to Assistant LCSO in November or December 2006 or at a later date. CSO Quist and others at Akal have given conflicting statements about this, but CSO Quist told the Grand Rapids Police Department that he obtained this promotion in 2006.

The district court refused to consider seven of these promotions because they happened more than 300 days before Wierengo complained to the EEOC. *See* 42 U.S.C. § 2000e-5(e)(1) (establishing a 300-day statute of limitation). Wierengo does not mention, much less challenge, this determination on appeal. Consequently, she has forfeited consideration of the issue. *See Clements v. Brunton*, 230 F.3d 1357, 2000 WL 1359628, at *1 (6th Cir. 2000) (unpublished table disposition).

That leaves the 2006 hiring of a new site supervisor and assistant lead security officer. Under the *McDonnell Douglas* framework, Wierengo must first make out a *prima facie* case of discrimination. To do so, she must show: (1) she is a member of a protected class; (2) she applied for and was qualified for the promotion; (3) she was denied the promotion; and (4) other employees of similar qualifications who were not members of the protected class received promotions around the time same. *Provenzano v. LCI Holdings, Inc.*, 663 F.3d 806, 812–13 (6th Cir. 2011).

We agree with the district court and hold that Wierengo has failed to establish her *prima facie* case. First, Wierengo has not shown that she was qualified for either promotion. She claims that she has "a broad range of skills, experience and depth," but she does not describe what those skills are, much less explain how they qualify her for a job as a site supervisor or lead security officer. In fact, Wierengo does not even discuss the basic duties of the two positions. We "simply cannot make assumptions about her qualifications." *See Peltier v. United States*, 388 F.3d 984, 990 (6th Cir. 2004).

Even assuming Wierengo was qualified for the positions, she has not shown that she had similar qualifications to Cuperus and Quist, the two men who were hired instead. *See White v. Columbus Metro. Hous. Auth.*, 429 F.3d 232, 243 (6th Cir. 2005) ("Some comparison between [the plaintiff and the person ultimately selected] is therefore necessary in considering the fourth prong of the *prima facie* case. Engaging in such a comparison does not impermissibly conflate the two stages of the *McDonnell Douglas* test . . . ."). Wierengo's briefs in the district court and on appeal simply state that she "had qualifications similar to those who were selected." She does not provide any evidence discussing Quist's promotion to assistant lead security officer or his qualifications. And, as pointed out by Akal, Cuperus—who was promoted to new site supervisor—had thirty years of police experience, including fourteen years of supervisory experience as a sergeant and detective sergeant. Comparatively, Wierengo only had twelve years of police experience and no experience in a police supervisory role. Although Wierengo's burden at the *prima facie* stage is not onerous, she must provide some evidence supporting all four elements of her case. She has not done so.

## IV.

Wierengo next argues that the district court incorrectly granted summary judgment in favor of Akal on her hostile-work-environment claim. To survive summary judgment, Wierengo must show that: "(1) she was a member of a protected class; (2) she was subjected to unwelcome discriminatory harassment; (3) the harassment complained of was based on sex; (4) the charged sexual harassment created a hostile work environment; and (5) [Akal] is liable." *Randolph v. Ohio Dep't of Youth Servs.*, 453 F.3d 724, 733 (6th Cir. 2006). Even assuming Wierengo can establish the first four elements of a hostile-work-environment claim, Wierengo cannot establish the fifth element.

An employer's liability for a hostile work environment depends in part on whether the harassment was committed by a coworker or supervisor. *Williams v. Gen. Motors Corp.*, 187 F.3d 553, 562 (6th Cir. 1999). A plaintiff can establish liability based on a supervisor's participation in the harassment or the employer's negligence in discovering and remedying coworker harassment, or both. *See Waldo v. Consumers Energy Co.*, 726 F.3d 802, 813 n.2 (6th Cir. 2013). If the employee alleges both as bases for liability, the court must separate the conduct. *See Williams*, 187 F.3d at 562.

Wierengo does not point to any evidence suggesting that any improper action was taken by a "supervisor," as that term applies to hostile-work-environment claims. "'[S]upervisor' is a term of art that denotes more than an individual with a higher rank, a superior title, or some oversight duties." *Montgomery v. Am. Airlines, Inc.*, 626 F.3d 382, 390–91 (7th Cir. 2010). Wierengo must provide evidence showing that Quist, Czarnecki or Blumenstein had the power to take "tangible employment action" against her. *See Vance v. Ball State Univ.*, 133 S. Ct. 2434, 2439 (2013). Because she has not done so, we analyze her claim using the standard for coworker liability. *See Waldo*, 726 F.3d at 813 n.2; *Montgomery*, 626 F.3d at 390.

Under this standard, Wierengo must establish that Akal knew or should have known of the harassment yet failed to take prompt and appropriate corrective action. *Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 338 (6th Cir. 2008). When an employer takes action to address known sexual harassment by coworkers, it can only be liable if "'its response manifests indifference or unreasonableness in light of the facts the employer knew or should have known.'" *Id.* (quoting *Blankenship v. Parke Care Ctrs., Inc.*, 123 F.3d 868, 872–73 (6th Cir. 1997)).

We agree with the district court that Akal responded appropriately to Quist's alleged advance. Wierengo admits that she did not report the advance until five months after it happened. And as soon as Akal found out, it immediately reassigned Quist and started an investigation. Similarly, when Wierengo told Akal about the parking incident, Akal again took immediate action and ordered Quist to park elsewhere. Akal did not have a duty to ensure that Wierengo and Quist were separated at all times. *See Mullins v. Goodyear Tire & Rubber Co.*, 291 F. App'x 744, 749 (6th Cir. 2008) (refusing to impose Title VII liability for failing to keep two employees separated). But even after Akal's internal investigation found that Wierengo's claims were largely unsubstantiated, Akal continued to take corrective action. It made Quist's reassignment permanent, continued to ban him from the parking garage, and required that Quist and others undergo sexual harassment training. Nothing about Akal's response suggests that it was indifferent or unreasonable.

Akal also took appropriate corrective measures as to the other harassing conduct. Wierengo testified that she first complained about sexual harassment to a manager on February 22, 2007.[2] This letter did not name the alleged harassers or describe the alleged harassment. Akal made efforts to discuss the allegations with Wierengo, but Wierengo refused to cooperate. It is unclear what actions Wierengo expected Akal to take when Akal did not know the identity of the harassers or even the nature of the alleged harassment. Akal cannot be said to have acted indifferently or unreasonably "in response to events to which it was not given an opportunity to respond." *Mullins*, 291 F. App'x at 750. Indeed, when Akal received yet another complaint

---

[2] Wierengo later submitted an affidavit claiming that she complained much earlier. But the district court correctly refused to consider it. *See Aerel, S.R.L. v. PCC Airfoils, L.L.C.*, 448 F.3d 899, 908 (6th Cir. 2006) ("A directly contradictory affidavit should be stricken unless the party opposing summary judgment provides a persuasive justification for the contradiction."). In any event, Wierengo does not argue that the district court erred by not considering this portion of her affidavit.

about sexual harassment (the Quist incident), it immediately sent an investigator. We therefore hold that Wierengo has failed to provide any basis to hold Akal liable for the alleged harassment.

**V.**

To establish a *prima facie* case of retaliation, Wierengo must show that (1) she engaged in protected activity; (2) Akal knew of her exercise of the protected right; (3) she suffered an adverse employment action; and (4) there was a causal connection between the protected activity and the adverse employment action. *Hawkins*, 517 F.3d at 345. In the retaliation context, "adverse employment action" is defined as any "conduct that would have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Id.* (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 60 (2006)). An employer can be held responsible for a coworker's retaliatory conduct if:

> (1) the coworker's retaliatory conduct is sufficiently severe so as to dissuade a reasonable worker from making or supporting a charge of discrimination, (2) supervisors or members of management have actual or constructive knowledge of the coworker's retaliatory behavior, and (3) supervisors or members of management have condoned, tolerated, or encouraged the acts of retaliation, or have responded to the plaintiff's complaints so inadequately that the response manifests indifference or unreasonableness under the circumstances.

*Id.* at 347.

If Wierengo establishes her *prima facie* case, the burden of production shifts to Akal to "'articulate some legitimate, nondiscriminatory reason'" for the adverse employment action. *See Dixon v. Gonzales*, 481 F.3d 324, 333 (6th Cir. 2007) (quoting *Morris v. Oldham Cnty. Fiscal Ct.*, 201 F.3d 784, 792 (6th Cir. 2000)). If Akal satisfies its burden, Wierengo must show that the employer's reason "'was not the true reason for the employment decision.'" *Id.* (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981)).

**A.**

Wierengo first argues that she was "shunned and ostracized" by Blumenstein and Cuperus, as well as most of her fellow CSOs. She does not provide many examples of this "shunning." From her affidavit, it seems like the majority of the "shunning" consisted of coworkers avoiding her during the work day. But "[a]n employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience." *Burlington N. & Santa Fe Ry. Co.*, 548 U.S. at 68; *see also, e.g.*, *Creggett v. Jefferson Cnty. Bd. of Educ.*, 491 F. App'x 561, 569 (6th Cir. 2012) ("Creggett's perception that Brown shunned and avoided him is not a materially adverse action."). Similarly, the complaint made against Wierengo by thirteen of her coworkers, without more, does not rise to the level of an adverse employment action. Wierengo does not allege that this complaint resulted in any sort of "injury or harm" to her professionally or personally. *See id.* at 67 ("The antiretaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm."). And although Akal investigated the complaint, it ultimately took no action on it. It is unlikely that a reasonable employee would be dissuaded from filing a discrimination complaint in these circumstances.

One act, however, is potentially more serious. Wierengo says that Lead CSO Blumenstein intentionally failed to tell her about a threat in the building. As a Lead CSO, Blumenstein did not have the power to take adverse employment actions and therefore was not Wierengo's supervisor. *See Vance*, 133 S. Ct. at 2439, 2443; *see also* R. 83-2, Gunn Aff. ¶ 4. Because Blumenstein was not Wierengo's supervisor, Akal cannot be held liable for his conduct unless supervisors or members of Akal's management had actual or constructive knowledge of Blumenstein's conduct and tolerated it, or responded inadequately to Wierengo's complaints.

*Hawkins*, 517 F.3d at 347. That cannot be claimed here where Wierengo has identified nothing in the record showing that she, or anyone, reported the incident to Akal or otherwise described it to a supervisor. Accordingly, Wierengo has not established a prima facie of retaliation.

**B.**

Wierengo briefly mentions the fact that she was placed on paid administrative leave during Akal's investigation of her sexual-harassment and assault claims in the context of her retaliation argument. Read liberally, this can be construed as a new retaliation claim. However, Wierengo did not include these facts in her complaint or argue them on summary judgment. Again, Wierengo cannot add new claims on appeal. *See Bridgeport Music, Inc.*, 508 F.3d at 400.

Even assuming Wierengo's claim can proceed, she has not established that the paid administrative leave was pretextual. Akal argues that it placed her on administrative leave during its investigation because Wierengo was observed crying while in uniform and carrying a loaded gun. Wierengo does not deny these facts. Instead, she argues that tears were an appropriate response. This is beside the point. We have upheld placements on paid administrative leave for similar reasons, *see Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 597 (6th Cir. 2007) (collecting cases and holding that a pending investigation is sufficient to warrant brief placement on paid leave), and Wierengo does not offer any evidence suggesting that Akal had any other motive.

**C.**

Lastly, Wierengo argues that the district court erred by granting summary judgment on her retaliatory-discharge claim. We disagree. Even assuming that she established her *prima facie* case, Wierengo has failed to show that there is a genuine issue of material fact as to pretext.

On December 21, 2007, at the direction of the U.S. Marshals Service, Janet Gunn, Akal's Vice President of Human Resources placed Wierengo on unpaid administrative leave pending investigation of the December 18 lobby incident. After thoroughly reviewing the investigator's report about the incident, Gunn recommended to the U.S. Marshals Service that Wierengo receive a five-day suspension. The U.S. Marshals Service rejected the recommendation and directed Akal to permanently remove Wierengo from performance on its contract. Wierengo questions the validity of the report, arguing that it does not accurately describe the events. But even taking Wierengo's arguments as true, "[a]s long as an employer has an honest belief in its proffered nondiscriminatory reason . . . , the employee cannot establish that the reason was pretextual simply because it is ultimately shown to be incorrect." *Majewski v. Automatic Data Processing, Inc.*, 274 F.3d 1106, 1117 (6th Cir. 2001). The touchstone of the honest-belief doctrine is whether supervisors reasonably relied on particularized facts available to the company and whether they made a "'reasonably informed and considered decision.'" *Abdulnour v. Campbell Soup Supply Co.*, 502 F.3d 496, 503 (6th Cir. 2007) (quoting *Smith v. Chrysler Corp.*, 155 F.3d 799, 807 (6th Cir. 1998)).

Akal is protected by the honest-belief doctrine. At the time she made the recommendation to suspend Wierengo, Gunn had a full report of the incident in front of her. The report included interviews with eight people. It also included a statement from Wierengo admitting that it was "possible" she had bumped shoulders with another CSO and that she "didn't know" if she had yelled obscenities in a public part of the courthouse. The fact that Wierengo now firmly insists that she did not bump her coworker's shoulder or yell obscenities in the courthouse is irrelevant to what Gunn believed at the time she made the recommendation. Likewise, the fact that Wood or Wierengo's coworkers may have falsified the report, without

more, is not enough to show pretext. *See Ladd v. Grand Trunk W. R.R., Inc.*, 552 F.3d 495, 503 (6th Cir. 2009) (holding that even if all of the plaintiff's coworkers lied to the employer, the employer still was not liable if it acted upon an honest belief in its non-discriminatory reason and made a reasonably informed and considered decision). Wierengo has provided no evidence showing that Gunn knew or should have known to doubt the report.

Similarly, Wierengo has failed to show that Akal's decisions to place Wierengo on administrative leave and fire her were pretextual. As pointed out by Akal, the U.S. Marshals Service directed that Wierengo be temporarily removed from duty at the courthouse pending the outcome of the investigation. And, after receiving the report and Akal's suggested course of action, the U.S. Marshals Service demanded that Wierengo be permanently removed from security detail at the courthouse. Akal did not have any other court security contracts in Michigan at the time and therefore had to fire Wierengo. Following neutral company policy and contractual obligations are legitimate, nondiscriminatory reasons. *See Blackshear v. Interstate Brands Corp.*, 495 F. App'x 613, 618 (6th Cir. 2012); *Hollins v. Atl. Co.*, 188 F.3d 652, 661 (6th Cir. 1999). Wierengo's speculation that Akal somehow "improperly tainted the opinion of the U.S. Marshals Service" is not enough to create an issue of fact as to whether this reason was pretextual.

## VI.

Wierengo also appeals the district court's denial of her motion to compel. The court determined that Wierengo's motion was "baseless." It chastised Wierengo for claiming that Akal delayed discovery, noting that Wierengo waited more than three months to send her first discovery requests. And it rejected Wierengo's arguments that Akal had improperly failed to produce relevant documents and a videotape. The district court was understandably frustrated

with Wierengo's motion, which was forty-seven pages long and contained "scattered and circuitous narrative set within a series of unsupported allegations and unreasonable grievances." The court encouraged Akal to submit a motion for attorneys' fees under Rule 37(a)(5)(B). Akal took the court's advice, and the district court ordered Wierengo to pay Akal $7,525 as a sanction.

On appeal, Wierengo does not acknowledge the analysis behind the district court's decision, much less explain why the decision was an abuse of discretion. *See Evans v. Sir Pizza of Ky., Inc.*, 476 F. App'x 605, 608 (6th Cir. 2012) (affirming the denial of several motions to compel because "[plaintiff] does not explain why these decisions were an abuse of discretion"). She appears to focus on Akal's alleged failure to produce security footage in a "viewable" format. But she does not address the district court's conclusion that she had viewed the video, received a copy of it from the U.S. Marshal Service, and failed to explain how Akal "withheld" it. Wierengo also does not explain, nor provide authority for, her contention that Akal had a legal duty to produce the video footage in a different, non-native format. In fact, she does not even provide enough evidence showing that Akal either had the video or that it destroyed it in bad faith.[3] Without more, it is impossible to say that the district court abused its discretion on this issue.

To the extent Wierengo challenges the district court's refusal to consider other discovery issues contained in her rambling, often incoherent motion to compel, the district court cannot be faulted for refusing to do the work of Wierengo's counsel. The district court did not have a duty to undertake a detailed review of the discovery record, nor did it have a duty to manufacture legal arguments based on that review. *See Emerson v. Novartis Pharms. Corp.*, 446 F. App'x

---

[3] Wierengo points to deposition testimony suggesting that Akal's investigator had a copy of the footage on his laptop; however, it cannot be inferred from this testimony alone that Akal destroyed the copy "in bad faith."

733, 736 (6th Cir. 2011) (holding that the "district court did not need to independently consider whether there were any other arguments or facts that [plaintiff] could have cited to that might have been sufficient"); *Wimbush v. Wyeth*, 619 F.3d 632, 638 n.4 (6th Cir. 2010) ("[I]t was [plaintiff's] job to point to the evidence with specificity and particularity in the relevant brief rather than just dropping a pile of paper on the district judge's desk and expecting him to sort it out.").

## VII.

For the above reasons, we affirm the district court's denial of Wierengo's motion to compel and its grant of summary judgment in favor of Akal.