NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 14a0738n.06

Case No. 14-1068

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

FILED
Sep 22, 2014
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| AIDAMARK, INC., | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
| | ) | THE WESTERN DISTRICT OF |
| ROLL FORMING CORPORATION, | ) | MICHIGAN |
| | ) | |
| Defendants-Appellees. | ) | |
| | ) | |
| | ) | |

BEFORE: COOK and GRIFFIN, Circuit Judges; RICE, District Judge[*]

RICE, District Judge. Plaintiff-Appellant Aidamark, Inc. ("Aidamark"), appeals the district court's decision granting summary judgment in favor of Defendant-Appellee Roll Forming Corporation, Inc. ("RFC"). Believing that it was owed unpaid sales commissions after RFC terminated a long-standing agreement between the parties, Aidamark filed suit alleging breach of contract, a violation of the Michigan Sales Representative Act ("MSRA"), Mich. Comp. Laws § 600.2961, and claims for accounting and declaratory judgment. Because the district court correctly determined that the undisputed evidence showed that Aidamark received

---

[*]The Honorable Walter H. Rice, United States District Judge for the Southern District of Ohio, sitting by designation.

all the sales commissions to which it was entitled under the parties' agreement, we AFFIRM the judgment of the district court.

## I.     FACTUAL BACKGROUND

Aidamark is a closely-held Michigan corporation with its principal place of business in Rockford, Michigan.  Its sole shareholder is Rick Engvall ("Engvall").  RFC is a Kentucky corporation that manufactures roll-formed steel parts, and its principal place of business is Shelbyville, Kentucky.

Aidamark and RFC entered into an agreement (the "Agreement") on May 27, 2003, under which Aidamark was to function as the "exclusive sales representative" of RFC for the sale of its products in Michigan and several Indiana counties.  Under the Agreement, Aidamark was entitled to "a commission of 5% on net billed sales of all roll[-]formed products" that Aidamark sold in its sales territory and were "shipped by" RFC.  Sales commissions were "considered as earned on the date of payment by the customer for the products" that Aidamark sold.  Although Aidamark functioned as RFC's sales representative, the Agreement carefully defined the scope of the representation by placing restrictions on Aidamark's activity.  For example, Aidamark could collect orders and submit them for approval to RFC, but could not "commit, obligate, or bind Roll Forming Corporation in any manner whatsoever, contractually, or otherwise," under the Agreement.  Any price quote had to be obtained from RFC and "formally presented on Roll Forming Corporation standard quotation form for delivery by [Aidamark] [to] the customer."  The Agreement could be "terminated in its entirety at any time" by either party with ninety days' advance written notice.

On June 16, 2008, Engvall, on behalf of Aidamark, and Geoff Repp ("Repp"), on behalf of RFC as its Sales Manager, signed an addendum to the Agreement that identified the specific accounts assigned to Aidamark. Among the accounts listed were Steelcase, an office furniture manufacturer, and Interkal, a manufacturer of telescoping spectator bleachers. Aidamark's claims of unpaid sales commissions arose from transactions between RFC and those two companies.

In 1998, RFC began manufacturing roll-formed metal products for Steelcase's "Answer" line of office furniture and cubicle panel systems. Aidamark was not involved in the sales of the original "Answer" line of products, but it functioned as RFC's representative to Steelcase on sales of other products. Steelcase began a redesign of its "Answer" line, which ultimately became known as the "Answer JT" line.

After several years of negotiation, development, and meetings between Steelcase, Aidamark, and RFC's engineers, Steelcase decided to award the supplier contract to RFC for the roll-formed parts in the "Answer JT" line in July of 2010. The parties memorialized the award in several agreements. They signed a "Master Purchasing Agreement" on July 1, 2010, which set forth "some of the terms and conditions" that applied when Steelcase purchased RFC's products while acknowledging that other agreements would provide the pricing terms and other specifics for particular orders. The "Schedule of Product," which took effect on December 8, 2010, was such an agreement. It provided for a "fixed term" of five years, and its provisions referenced a schedule that set forth the "initial prices" for RPC's products and lead times before delivery. Under Section 5.9, RFC was described as "the sole supplier of all products listed in Schedule A, unless you are unable to reasonably meet [Steelcase's] quality and delivery requirements for the

Products in Schedule A." The "Schedule of Product" also incorporated by reference the provisions of the "Master Purchasing Agreement."[1]

Aidamark also serviced RFC's account with Interkal, a manufacturer of spectator bleachers. In 2000, Interkal and RFC entered into an agreement that designated RFC as the sole supplier of certain parts. Although the agreement specified an initial five-year term, the agreement stated that it would be "extended indefinitely," but could be canceled by either RFC or Interkal with six months' advance written notice.

In early 2010, RFC and Aidamark began to discuss plans to engage Interkal in a new long-term agreement. Although a draft was submitted to Interkal, the parties were unsuccessful in getting Interkal to sign it, causing them to suspect that Interkal was shopping around for a new supplier. The suspicion was confirmed in May of 2011, when Interkal terminated its relationship with RFC. Engvall reminded Repp that Interkal was required to provide six months' notice before terminating the agreement, and Interkal agreed to honor the provision and continue to order from RFC for six more months.

Two weeks later, on June 2, 2011, RFC sent a letter to Aidamark stating that it was terminating the Agreement, thereby ending Aidamark's role as a sales agent for its products. RFC provided Aidamark with a sales commission statement on August 31, 2011, stating that Aidamark would be paid $26,529.90 for payments on invoices that it had received. The statement also listed $49,227.38 in commissions that RFC considered not earned under the

---

[1] Another agreement, the "Statement of Work," was signed on October 5, 2010, pursuant to the Master Purchase Agreement. The "Statement of Work" concerned services RFC would provide in the "Answer JT" design process, rather than the production of roll-formed parts, and was not the subject of Aidamark's claims.

Agreement, as it had not received payment from its clients for those invoices before the effective termination date of the Agreement. On September 29, 2011, RFC paid Aidamark $26,529.90 in commissions for payments that RFC had received as of August 31, 2011.

## II.   PROCEDURAL BACKGROUND & SUMMARY JUDGMENT DECISION

Aidamark filed suit against RFC on February 29, 2012, in the 17th Circuit Court for Kent County, Michigan. In its complaint, Aidamark alleged that it had not been paid "three categories of commissions" by RFC. First, Aidamark alleged that RFC owed it for the $49,227.38 of invoiced sales described in the August 31, 2011, commission statement. Second, Aidamark alleged that it was owed approximately $50,000 in sales commissions for purchases made by Interkal. Third, Aidamark alleged that it had not been paid any commissions that it was owed under RFC's agreement with Steelcase to supply parts for the "Answer JT" product. According to Aidamark, it had "procured" the sales to Interkal that had been ordered but not shipped by August 31, 2011. Aidamark also alleged that it had "procured" RFC's sales to Steelcase for the "Answer JT" product, as it had "procured an agreement between RFC and Steelcase with estimated sales . . . of $5 million to $7 million per year." Aidamark alleged a claim for breach of contract and a violation of the MSRA, Mich. Comp. Laws § 600.2961, as well as claims for accounting and declaratory judgment, and sought relief in the form of actual damages, penalty damages, and statutorily authorized attorneys' fees.

On March 27, 2012, RFC removed the case to the United States District Court for the Western District of Michigan on the basis of diversity jurisdiction.

RFC filed for summary judgment on January 11, 2013, which the district court granted on December 27, 2013. In its decision, the district court found the language of the Agreement between Aidamark and RFC to be unambiguous, and read its terms to define Aidamark's commissions as "earned" only upon RFC's receipt of payment from a customer. The court also held that RFC had demonstrated that the undisputed facts showed that RFC had paid commissions on all orders for which it received payment prior to the August 31, 2011, termination date of the Agreement.[2]

The district court also held that because the Agreement did not contain a provision that addressed post-termination commissions, the procuring cause doctrine applied as a matter of law to its terms. Citing Michigan law, the court noted that the procuring cause doctrine allows an agent who was "the procuring cause of the sale" to recover a sales commission, even if he or she did not personally conclude or complete the sale. However, according to the district court, the undisputed facts showed that Aidamark had not been the procuring cause of any of the sales in question. Although Aidamark had assisted RFC in procuring the "Answer JT" account and agreement, the district court reasoned that the Agreement only allowed commissions on the actual sale of goods, not future sales from a procured account or customer. The district court also rejected Aidamark's argument that the Steelcase/RFC agreement was a requirements contract, and reasoned that even if it were, Aidamark would still have had to prove that it was the

---

[2] Aidamark also argued that any provision of the Agreement that would have eliminated its post-termination commission was void under Mich. Comp. Laws § 600.2961(8), a provision of the MSRA that declares void any contract provision that purports to waive a right set forth by the statute. The district court rejected this argument, finding that provision of the MSRA inapplicable because the Agreement did not contain a provision that addressed post-termination commissions. Since Aidamark did not raise this particular argument on appeal, same is considered abandoned.

procuring cause of any order submitted under it to RFC. Furthermore, although the sole purchase order made by Steelcase was placed and paid for during the Agreement's ninety day post-termination period, both events occurred after the June 2, 2011, date that marked the end of Aidamark's representation of RFC to RFC's clients. Thus, there was no evidence to show that Aidamark was the procuring cause of that order. The same was true for the Interkal orders placed after June 2, 2011, because Aidamark pointed to no evidence to show that it procured those orders. Because Aidamark was not entitled to any post-termination sales commissions, its accounting and declaratory judgment claims also failed as a matter of law. Accordingly, the district court granted summary judgment in favor of RFC.

Aidamark filed a timely appeal of the district court's judgment.

## III. STANDARD OF REVIEW

We review a district court's grant of summary judgment *de novo*. *Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 332 (6th Cir. 2008). A moving party is entitled to summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When ruling on a motion for summary judgment, a court must assume as true the evidence of the nonmoving party and draw all reasonable inferences in that party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970)).

## IV. ANALYSIS

Aidamark presents three main arguments on appeal. First, it argues that RFC's contracts with Steelcase and Interkal were requirements contracts that created "sales" when they were

entered into, and therefore the district court erred in holding that no sales occurred until RFC actually received payment for orders. Second, Aidmark argues that the district court incorrectly held that it was not entitled to receive commissions after the date that the Agreement was terminated, because the provision governing commissions only "governs the *timing* of when a commission must be paid," not whether or not the commission is earned. Third, it argues that the district court incorrectly applied the procuring cause doctrine by requiring Aidamark to show that it was the procuring cause of individual sales, rather than the procuring cause of the contracts between RFC and its customers.

Where, as here, an action arises under diversity of citizenship jurisdiction, "a court must apply the same substantive law as would have been applied if the action had been brought in a state court of the jurisdiction where the federal court is located." *Corrigan v. U.S. Steel Corp.*, 478 F.3d 718, 723 (6th Cir. 2007). Michigan law, therefore, applies to Aidamark's claims.

**A. Regardless of whether the Steelcase and Interkal contracts were requirements contracts, Aidamark was not entitled to sales commissions on anything but net billed sales for products shipped by RFC.**

Aidamark insists that RFC's contracts with Steelcase and Interkal were requirements contracts, which, by its definition, constituted "sales" for which it was owed commissions under the Agreement. The district court concluded that none of the "Answer JT" agreements with Steelcase required Steelcase to purchase any products from RFC, and, even if they did, Aidamark would only be entitled to commissions on purchase orders that it had procured.

A requirements contract, which measures the quantity of goods sold according to the buyer's "good faith" requirements, is a valid contract for the sale of goods under Michigan's statutory adoption of the Uniform Commercial Code ("UCC"). Mich. Comp. Laws § 440.2306;

*see also Precision Rubber Prods. Corp. v. George McCarthy, Inc.*, 872 F.2d 187, 188 (1989) (recognizing the enforceability of requirements contracts under "elementary contract law principles of offer and acceptance, which state that a contract may be formed even before the specific details of the time, place, and quantity of delivery are fixed"). The purpose of the UCC provision governing requirements contracts is to fill in the gaps of a vague or ambiguous contract for the sale of goods between a buyer and seller. *See* Mich. Comp. Laws § 440.2306, cmt. 1 (stating that the statute "applies to such contracts of nonproducing establishments such as dealers or distributors as well as to manufacturing concerns," whose "commercial background and intent" will be read "into the language of any agreement").

However, as the district court correctly pointed out, a determination that the contracts between RFC and its customers were proper requirements contracts would not have helped Aidamark's case. Even if the Steelcase and Interkal contracts were indefinite, vague, or failed to contain terms that allowed those parties to agree that a particular sale of goods occurred without applying the Michigan statute, any such controversy would be irrelevant to the determination of whether Aidamark earned a commission on those sales. The Agreement between RFC and Aidamark allowed only commissions for "net billed sales," not any conceivable sale of goods that the UCC might recognize. The agreement placed specific conditions on what constituted "net billed sales" for purposes of earning a sales commission. First, the products had to be "sold by you in your territory" and "shipped by" RFC. Second, the products actually had to be paid for: "All commissions herein provided for shall be considered as earned on the date of payment by the customer for the products sold by you, and not before" payment. Under the terms of the

Agreement with RFC, Aidamark was only entitled to commissions on sales that RFC actually billed to its customers, received payment for, and shipped to them.

In *Precision Rubber*, we interpreted a termination clause in a manufacturer's representative agreement that allowed the representative to recover commissions "on all orders from the territory accepted within sixty (60) days following the effective date of termination and shipped by the Manufacturer within one (1) year subsequent to date of termination." 872 F.2d at 188. This language required a remand for a factual determination as to whether the orders in question had been accepted by the manufacturer, creating valid sales. *Id.* at 188-90. Here, in contrast, the Agreement contained language that limited, by definition, any sales commission to "earned" commissions based on payment RFC received for products that it had actually billed and shipped. Whether or not the contracts between RFC and its clients were "requirements" contracts is not determinative of whether Aidamark is entitled to sales commissions. Rather, it is the Agreement between Aidamark and RFC that defines the parties' rights. The Agreement only entitled Aidamark to recover commissions on sales that had been billed, shipped, and paid for, and it received payment for all products that met those criteria.

**B.  Aidamark was not entitled to receive commissions on orders for which RFC had billed but not yet received payment.**

Aidamark also argues that it was entitled to receive commissions after the termination date of the Agreement because, under its terms, the commissions had already been "earned." This argument is directed at the district court's interpretation of the Agreement and the ultimate conclusion that Aidamark had not earned any commissions on sales as defined therein.

Under Michigan law, "[a] party asserting a breach of contract must establish by a preponderance of the evidence that (1) there was a contract (2) which the other party breached (3) thereby resulting in damages to the party claiming breach." *Miller-Davis Co. v. Ahrens Constr., Inc.*, 848 N.W.2d 95, 104 (Mich. 2014) (citing *Stevenson v. Brotherhoods Mut. Benefit*, 19 N.W.2d 494 (Mich. 1945)). The interpretation of contract language is a matter of law. *Wilkie v. Auto-Owners Ins. Co.*, 664 N.W.2d 776, 780 (Mich. 2003). Courts "examine the language in the contract, giving it its ordinary and plain meaning if such would be apparent to a reader of the instrument." *Id.* "If the language of the contract is unambiguous," a court will "construe and enforce the contract as written." *Quality Prods. & Concepts Co. v. Nagel Precision, Inc.*, 666 N.W.2d 251, 259 (Mich. 2003) (citing *Farm Bureau Mut. Ins. Co. of Mich. v. Nikkel*, 596 N.W.2d 915, 919 (Mich. 1999)).

According to Aidamark, the following language from Paragraph 2 of the Agreement demonstrates that the sale of a product was all that was required to trigger RFC's obligation to pay a sales commission: "We agree to pay you a commission of 5% on net billed sales of all roll[-]formed products sold by you . . . ." Aidamark also argues that the district court incorrectly interpreted Paragraph 6 of the Agreement to require payment from a customer for Aidamark to earn its sales commission, contending that its language simply "governs the *timing* of when of a commission must be paid."

In its entirety, the relevant sentence of Paragraph 2 states:

> We agree to pay you a commission of 5% on net billed sales of all roll[-]formed products sold by you in your territory as above defined and shipped by us, except cases where the quantities are large and the competitive situation indicates a reduction in price, in which cases your commission will be the subject of discussion and agreement prior to our accepting the order.

The relevant portion of Paragraph 6 states:

The commissions on net billed sales, as provided for herein, are in full payment for all services rendered by you under this agreement. All commissions herein provided for shall be considered as earned on the date of payment by the customer for the products sold by you, and not before, and all commissions earned shall be payable on the 10th of the month following that in which payment is received from the customer.

The district court correctly held that the language of the Agreement was unambiguous, and it correctly interpreted Paragraph 6 to require payment by a customer *before* Aidamark earned its sales commission. Aidamark's emphasis on the "timing" of its receipt of a sales commission payment distracts from the contractual substance of Paragraph 6: the creation of a condition precedent to RFC's performance of sales commission payment. Although the district court did not expressly characterize the language of Paragraph 6 as creating a condition precedent, that is clearly what it considered "payment by the customer" to RFC to be, and rightly so. "A 'condition precedent' is a fact or event that the parties intend must take place before there is a right to performance." *Yeo v. State Farm Ins. Co.*, 555 N.W.2d 893, 895 (Mich. Ct. App. 1996) (citing *Knox v. Knox*, 59 N.W.2d 108, 118 (Mich. Ct. App. 1953)). The right to performance that Aidamark seeks to enforce is RFC's payment of earned sales commissions. Paragraph 6, however, requires the event of "payment by the customer" to take place before a sales commission is earned. Sales commissions are "earned" only on the date that a customer pays, "and not before." Once that condition precedent has been satisfied, "all commissions earned shall be payable," and Aidamark is then entitled to payment of the earned commissions. "A condition precedent is distinguished from a promise in that it creates no right or duty in itself, but is merely a limiting or modifying factor." *Real Estate One v. Heller*, 724 N.W.2d 738, 741 (Mich. Ct. App. 2006) (quoting *Mikonczyk v. Detroit Newspapers, Inc.*, 605 N.W.2d 360, 362

(Mich. Ct. App. 1999)). The event of "payment by the customer" is not a promise or a duty in itself, but an independent event that triggers Aidamark's right to payment of the earned commission. Although "courts are not inclined to construe stipulations of a contract as conditions precedent unless compelled by the language in the contract," the language of Paragraph 6 is unambiguous and compels this conclusion. *Id.* (quoting *Mikonczyk*, 605 N.W.2d at 362).

Finally, where a condition precedent "is not satisfied, there is no cause of action for a failure to perform the contract." *Harbor Park Mkt., Inc. v. Gronda*, 743 N.W.2d 585, 588 (Mich. Ct. App. 2007) (citing *Berkel & Co. Contractors v. Christman Co.*, 533 N.W.2d 838, 840 (Mich. Ct. App. 1995)). The district court properly granted summary judgment to RFC on Aidamark's breach of contract claim where the undisputed evidence showed that RFC paid Aidamark for all of the sales commissions earned by receipt of customer payment before the August 31, 2011, termination of the Agreement.

Aidamark cites *Bailey v. Fast Model Techs., LLC*, No. 10-15118, 2012 U.S. Dist. LEXIS 61383 (E.D. Mich. May 2, 2012), in which the U.S. District Court for the Eastern District of Michigan applied the MSRA to require the defendant to pay the plaintiff sales commissions that had accrued prior to the termination of the plaintiff's employment. As the district court in *Bailey* noted, the MSRA itself states that it is "[t]he terms of the contract between the principal and sales representative [that] determine when a commission becomes due." Mich. Comp. Laws § 600.2961(2). The only contract language examined in *Bailey* was a phrase stating that sales commissions had to be paid "at the end of each month once our account receivable department has received payment." Here, in contrast, the Agreement defines payment by the customer as the

event which determines whether a commission is actually earned. In *Bailey*, there was no discussion of payment as a condition precedent to earning a commission.

### C. The district court correctly applied the procuring cause doctrine.

Under the procuring cause doctrine, an "agent is entitled to recover his commission whether or not he has personally concluded and completed [a] sale, it being sufficient if his efforts were the procuring cause of the sale." *Kuzin v. A & J Precision Tool Co.*, No. 217895, 2001 WL 694089, at *4 (Mich. Ct. App. Mar. 30, 2001) (per curiam) (footnote omitted). The district court held that the procuring cause doctrine applied to the Agreement because of the Agreement's silence on post-termination commissions. This was correct, as indeed the Agreement is silent as to such commissions.

Application of the procuring cause doctrine does not, however, resuscitate Aidamark's claims or entitle it to commissions on sales. At best, the contracts between RFC and Interkal and RFC and Steelcase demonstrated that Aidamark played some role in procuring those customers for RFC. However, Aidamark pointed to no evidence in the record of any individual sales, as defined by the Agreement, for which it had not received a commission. Accordingly, the district court properly awarded summary judgment to RFC on Aidamark's claim that it was the procuring cause of any such sales.

## V. CONCLUSION

For the foregoing reasons, the district court's grant of summary judgment is AFFIRMED.